HOOD, Judge.
This is a suit on a promissory note. It was instituted by Guaranty Bank & Trust Company of Alexandria, Louisiana, against C & R Development Co., Inc., and Robert E. Clark. Clark made no appearance and a default judgment was rendered against him. C & R Development Company answered and filed a reconventional demand for judgment against the Guaranty Bank for $13,256.35. The bank then filed a third party demand against Clark, seeking a judgment against him for any sum which it might be condemned to pay to the Development Company.
C & R Development Company instituted bankruptcy proceedings while the suit was pending. A trustee was appointed for it, and the trustee has been substituted for the bankrupt corporation as a party to this suit. The parties stipulated that the balance due by C & R Development to plaintiff bank on the promissory note sued upon was $1,840.30.
Judgment on the merits was rendered by the trial court as follows: (1) In favor of plaintiff and against the Trustee of C & R Development Company and Clark, in solido, for $1,840.30; (2) in favor of the Trustee for C & R Development Company, and against Guaranty Bank, for $12,502.41; and (3) reserving to plaintiff bank all of its rights under its third party demand. Plaintiff, Guaranty Bank & Trust Company, has appealed.
The principal question presented is whether the trial court erred in holding that plaintiff, Guaranty Bank, is liable to defendant, the Trustee of C & R Development Company, under Sections 5 and 8 of the Uniform Fiduciaries Act (LSA-R.S. 9:3805 and 3808).
The facts are that C & R Development Company was organized and incorporated *16 on March 5, 1968. Its purpose was to buy and build homes for sale. The incorpora-tors of, and the sole owners of stock in, the company were John E. Rolen and his wife, Mrs. Rolen, and Robert E. Clark. Mr. Rolen owned 76 shares of stock, Mrs. Rolen owned one share, and Mr. Clark owned the remaining 23 shares. The three stockholders constituted the Board of Directors. Mr. Rolen was named and served as President, Mrs. Rolen was Vice President and Clark served as Secretary-Treasurer and Executive Vice President of the company. Mrs. Rolen also was designated as the- bookkeeper, and Clark served as general manager of the business of the corporation.
On April 4, 1968, the Board of Directors of C & R Development Company adopted a resolution authorizing Clark to act on behalf of the corporation in all things necessary in the conduct of the business of the company, including the power to convey on behalf of the corporation title to any and all property owned by it, movable or immovable. All parties agree that the adoption of this resolution had the effect of turning over to Clark the complete management of the corporation, and of formally authorizing him to issue checks on any banking account owned or maintained by the corporation.
Shortly after the corporation was formed, a checking account was opened by the officers in the name of the corporation in the Guaranty Bank. A copy of the above-described resolution was furnished to the bank as evidence of Clark’s authority, on his signature alone, to issue checks on that account. The bank, however, required that there also be a co-signer on the checks, and pursuant to that requirement Mrs. Rolen, the Vice President and bookkeeper, was authorized to co-sign all checks drawn on the corporation’s account in that bank. All checks which have been drawn on the company’s account in that bank thus have been signed by Clark and by Mrs. Rolen.
Clark, while managing the C & R Development Company, also owned another business known as the Pmeville Supply Company. As the sole owner of that business, Clark from time to time borrowed money from the Guaranty Bank. The obligations incurred by Clark to repay these loans made to him, individually or to Pine-ville Supply Company, were personal debts of Clark and were not obligations of C & R Development Company.
The trustee of the Development Company contends that during the period from April 4 to August 4, 1968, while Clark was managing the business of that company, six checks were drawn on the account of C & R Development Company in the Guaranty Bank, all of which checks were made payable to that bank, and that all or a part of the proceeds of those checks were applied to the payment of debts owed personally by Clark to the bank. He takes the position that the Guaranty Bank is obliged to pay or refund to the Trustee that part of the proceeds of each of those checks which was applied to Clark’s personal indebtedness. To support his reconventional demand, he relies principally on the provisions of the Uniform Fiduciaries Law (LSA-R.S. 9:3801-3814), and particularly Sections 5 and 8 (R.S. 9:3805 and 3808) of that law.
The evidence shows that between April 4 and August 4, 1968, six checks were drawn on the account of C & R Development Company in the Guaranty Bank, made payable to that bank, the dates and amounts of those checks being as follows :
$4,060.37 A O' co >
502.81 ^ S On CO >
195.02 u! vo On 00 g
195.02 ^00 qJ oq W
250.00 VO no On CO ‘ r* . V-
7,833.79 rt- ~ 1 — 4 NO 00 > a crq e
Only $27.72 out of the check dated May 15 and the same amount out the check dated July 8, 1968, were applied toward the payment of Clark’s personal indebtedness to the bank. All of the proceeds of the remaining four checks was applied to the payment of debts which Clark owed to Guaranty Bank. The aggregate sum of *17 $12,502.41 of C & R Development funds thus was applied toward the payment of debts which Clark individually owed to the bank.
All of the six checks above described were signed on behalf of the corporation by Robert E. Clark and were co-signed by Mrs. John E. Rolen. Mrs. Rolen testified that “Very often he [Clark] would bring [checks] to have them signed before they were even filled in with the name, because he would say he didn’t know the concrete finisher’s name.” She stated that she never signed a check drawn on the C & R Development Company’s account which was made out to the Guaranty Bank. Her testimony thus indicates that the Guaranty Bank was not listed as a payee on any of the above-described checks when she signed them. All parties concede that the Guaranty Bank was never informed of the fact that Mrs. Rolen had signed checks of the C & R Company before the checks were completely filled out, and that the bank had no knowledge of the fact that she had done so with reference to any of the above-mentioned checks or at any other time.
The evidence shows that the Guaranty Bank regularly mailed monthly bank statements to the C & R Company. Enclosed with each such statement, of course, were the cancelled checks which had been paid from that account during the preceding month. Mr. and Mrs. Rolen do not deny that such statements were sent, but they testified that they never saw them or any of the cancelled checks. The implication is that Clark received these statements and did not show them to the other officers of the corporation. The evidence is clear, however, that the bank had no reason to suspect that Mr. or Mrs. Rolen had not seen these statements each month as they were mailed to the corporation. We think the bank was justified in assuming that the officers of the corporation, and particularly the President and the bookkeeper, saw and examined these statements each month as they were delivered.
Mr. Rolen testified that he trusted Clark completely in the beginning, but that he began to get suspicious of him in May, 1968, about one month after the management of the corporation was turned over to him. He stated that he made repeated demands on Clark to see the bank statements, but that Clark “kept delaying” and did not produce them. Finally, Rolen employed an accounting firm to audit the books and in that manner he determined about August 19, 1968, that corporate funds were being used to pay Clark’s personal debts. Rolen concedes that in spite of Clark’s delaying tactics he did not ask anyone connected with the bank to show him the corporation’s bank statements, or to give him any information about the company’s account, until August 19, 1968.
Mrs. Rolen’s testimony is substantially to the same effect, except that she says she became suspicious of Clark about July, 1968, and that she and her husband went to the Pineville branch of the Guaranty Bank about August 19, 1968, had the branch manager show them the bank statements and determined at that time that the last-mentioned check for $7,833.79 had been issued and applied to Clark’s indebtedness to the bank.
On August 19, 1968, a special meeting of the Board of Directors and stockholders of C & R Development Company was held, with Mr. Rolen and Mrs. Rolen being the only directors present. A resolution was adopted at that meeting rescinding Clark’s authority to act for the corporation in any manner whatsoever. Mr. and Mrs. Rolen presented a copy of this resolution to the bank on the day it was adopted, August 19, and thereafter no other checks drawn on the Development Company’s account and signed by Clark were paid by the bank.
The check dated August 4, 1968, for $7,833.79 was a postdated check. Clark presented it to the bank about July 25 or 27, 1968, requesting that the bank hold it until August 4, and stating that he felt that there would be sufficient funds in the Development Company’s account to take care of *18 the check by that time. The postdated check was accepted by the bank to be held until August 4 or until such later date as funds were available in the account. Sufficient funds to cover the check were deposited in the account of C & R Development Company on or shortly before August 7, and the check was paid by the bank on that date. -Clark informed the bank official to whom the check was presented that C & R Development Company was purchasing from Clark the remainder of the stock of merchandise owned by Pineville Supply Company, and that this check represented the balance due on the purchase price. He also explained, as the reason for postdating the check, that the Development Company was “closing out some houses” that it had built, and expected to get paid for them by August 4. This explanation seemed reasonable to the bank officials and was accepted by them as being true. When the check eventually was paid, the bank complied with Clark’s instructions to apply the proceeds on Clark’s indebtedness to that bank.
While the above-mentioned check was being held, and before it was paid, the loan offider of the Guaranty Bank had an occasion to talk to Mr. Rolen, and at that time he discussed with him the C & R Development Company account. The loan officer asked Rolen “how much he was willing to go along to help Bob Clark.” The loan officer quoted Mr. Rolen as stating that he was “undecided.” Mr. Rolen’s version of. that conversation was that he told the bank official that he was not going to back Clark any further until he “found out exactly where we stand.” In any event, Rolen’s remarks indicated that he knew that C & R Development Company funds were being used to help Clark in his private business.
Rolen testified that prior to the time the $7,833.79 check was issued, he personally had purchased a part of the stock of merchandise from Pineville Supply Company, had resold it to C & R Development Company and had taken a note from that company representing the purchase price. The bank official was aware of the fact that such a transaction had taken place before the $7,833.79 check was ever presented to the bank. Clark’s representation to the bank, therefore, that the Development Company was purchasing the rest of the stock of Pineville Supply Company seemed reasonable, and his instructions to apply the check to his private indebtedness aroused no suspicion on the part of the agents of the bank.
On the basis of this evidence, the trial judge concluded that the Guaranty Bank is liable to the Trustee of C & R Development Company for $12,502.41, that being the total amount of corporation funds which were applied to the payment of Clark’s personal indebtedness. The trial court relied principally on LSA-R.S. 9:3805 and 3808 in reaching that conclusion.
The pertinent part of LSA-R.S. 9:3805 reads as follows:
“If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of, or as security for, a personal debt of the fiduciary, to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument.”
LSA-R.S. 9:3808 provides:
“If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal’s account the bank is authorized to pay any such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with the knowledge of such facts that its action in pay *19 ing the check amounts to bad faith. If, however, such a check is payable to the drawee bank and is delivered to it in payment of, or as security for, a personal debt of the fiduciary to it, the bank is liable to the principal, if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.”
The trial judge found that the two quoted sections of the Revised Statutes are applicable, and that the bank becomes liable upon a showing simply that Clark breached his obligation as a fiduciary. He held that the statutes imposed an “absolute liability” on the drawee bank under the circumstances presented here, and that it was immaterial whether the bank had or did not have actual knowledge of the breach of a fiduciary relationship or whether it was in good faith or bad faith.
The above-cited sections of the Revised Statutes obviously were enacted to protect the principal against an unfaithful fiduciary who issues a check on the principal’s account and wrongfully uses the proceeds for the fiduciary’s personal benefit. Here, the principal was C & R Development Company. The Trustee claims that Clark was the fiduciary and that he breached his obligation to the principal, C & R Development Company, by drawing or delivering the above-described checks.
The C & R Development Company, of course, is governed by a Board of Directors, consisting of three people. Two of them, constituting a majority of the Board of Directors, signed each of the six checks which form the basis for the reconventional demand. It thus is more logical to hold that these checks were issued and delivered by the principal, C & R Development Company, rather than by “a fiduciary.” The Uniform Fiduciaries Law does not require the drawee bank to reimburse the principal, where the check is drawn or delivered by the principal.
It is true that Mrs. Rolen relied on the representations made to her by Clark as to the purpose of the checks, and that she signed them before the names of the payees were inserted. We assume that in spite of her carelessness in this respect, the C & R Development Company has the right to recover its loss from Clark. In the instant suit, however, the Trustee is not attempting to recover from Clark. Instead, he seeks to recover from the Guaranty Bank, which was free from any fault at all.
If the Trustee’s position should be upheld here, then it would follow that the same conclusion would have to be reached if all three of the directors and stockholders had signed every check. The bank would be held to be liable to the corporation/ and thus the Rolens as stockholders would benefit, on a showing that Mr. and Mrs. Rolen had misplaced their confidence in Clark and had carelessly signed the checks without determining the purpose for which they were being issued. We think the bank had the right to assume that Mrs. Rolen, as well as Clark, was fully aware of the provisions of these checks and that all six checks were duly signed by two of the three officers and directors of the company.
It is significant, we think, that Sections 3802 through 3809, of Title 9 of the Revised Statutes, uniformly refer to “a” fiduciary. Since the cited sections refer only to a single fiduciary, there is considerable merit to the bank’s argument that the provisions of those sections do not apply to checks drawn on a principal when the checks are co-signed. It is unnecessary for us to determine in the instant suit whether the Uniform Fiduciaries Act could ever be applied where checks drawn on the principal are signed by more than one fiduciary. We hold, however, that Sections 3805 and 3808 cannot be applied to impose liability on the drawee bank, where a check is signed by two fiduciaries and only one of them breached his obligation as a fiduciary in drawing or delivering the check.
*20 Each of the six checks which are involved in this suit were signed by Clark and by Mrs. Rolen. The evidence indicates that Clark breached his obligation as a fiduciary in signing and delivering those checks. There is no suggestion, however, that Mrs. Rolen, the co-signer, breached any such obligation, and the proceeds of the checks were not used for her benefit. Since one of the fiduciaries who participated in drawing and delivering those checks did not breach her obligation as a fiduciary, the Uniform Fiduciaries Law does not apply and the trial court erred in holding the drawee bank liable.
The Trustee contends, however, and the trial court apparently agreed, that the drawee bank was liable, even though the Uniform Fiduciaries Law is not applicable. The case of Leadman v. First National Bank of Shreveport, 184 La. 715, 167 So.200 (1936), is cited as the principal authority for that argument. In the Lead-man case the drawee bank was held to be liable to plaintiff for amounts which had been withdrawn from his account by his tutrix, while he was a minor, and applied to the tutrix’s personal indebtedness to the bank. In that case, however, the check was signed by the tutrix alone, there being no co-signer on the check who did not benefit from the payment. Also, in that case the president of the bank had advised the tutrix as to her financial matters, the bank knowingly had accepted collateral belonging to the minor to secure the personal indebtedness of the tutrix, and the bank thus in effect was a party to the acts which culminated in the misappropriation of the minor’s funds. The circumstances presented in that case are different from those presented in the instant suit, and for that reason we do not consider the Leadman case to be applicable here.
For the reasons above stated, we conclude that the Guaranty Bank is not liable to the Trustee of C & R Development Company for the sums which were withdrawn from the corporation account and applied to the payment of Clark’s personal debts. Having reached that conclusion, it is unnecessary for us to consider the additional defense offered by the bank that the Trustee, in any event, is estopped from asserting the ’ claim urged in the reconven-tional demand.
For the reasons herein assigned, we affirm that part of the judgment appealed from which'is in favor of Guaranty Bank & Trust Company of Alexandria, and against E. Cecil Wiley, in his capacity of Trustee for C & R Development Company, Inc., and Robert E. Clark, jointly and in solido, in the amount of $1,840.30, together with interest thereon at the rate of 8% per annum from May 1, 1968, until paid, and 10% of the aggregate of principal and interest as attorney’s fees. We, however, reverse all of the remaining parts of the judgment appealed from, including particularly that part which condemns Guaranty Bank & Trust Company to pay to E. Cecil Wiley, Trustee, the sum of $12,502.41, with 5% interest thereon from judicial demand until paid. All costs of this suit, including those incurred in the trial court and on appeal, are assessed to E. Cecil Wiley, as and in his capacity of Trustee for C & R Development Company, Inc.
Affirmed in part, and reversed in part.
CULPEPPER, J., recused.
SAVOY, J., dissents, being of the opinion that the judgment of the district court is correct.