DIXON, Justice.
 

 Plaintiff, Guaranty Bank & Trust Company of Alexandria, Louisiana, instituted suit on a promissory note upon which the balance due was stipulated to be $1,840.30. Named as defendants were the C & R Development Company, Inc. (hereinafter called the corporation) and Robert E. Clark, a shareholder of the corporation. Clark made no appearance and a default judgment was taken against him. The corporation answered and filed a reconventional demand against the bank for $13,256.35. The bank filed a third party demand against Clark seeking a judgment against him for any sum which it might be condemned to pay to the corporation.
 

 During the pendency of this suit, the corporation filed for bankruptcy. A trustee was appointed and was substituted as a party to the suit pursuant to C.C.P. art. 807.
 

 The trial court rendered judgment in favor of the plaintiff and against the trustee
 
 *1179
 
 in bankruptcy and Clark, in solido, for $1,-840.30, and in favor of the trustee against the bank for $12,502.41, and reserved to the bank all rights to proceed on its third party demand. The bank appealed from the judgment. The Court of Appeal reversed that part of the judgment in favor of the trustee for $12,502.41.
 

 The corporation was formed in 1968 for the purpose to “buy and build homes for sale.” Incorporators and shareholders of the corporation were Clark, the owner of twenty-three shares, John E. Rolen, owner of seventy-six shares, and Mrs. Rolen, owner of one share. These three people constituted the board of directors. Mr. Rolen was the president, Mrs. Rolen was the vice president and Clark was the secretary-treasurer and executive vice president. Mrs. Rolen was the bookkeeper and Clark the general manager.
 

 Pursuant to a resolution o'f the board of directors, Clark was authorized to act on behalf of the corporation on all business transactions. He was formally authorized to issue all checks of the corporation on any of its accounts.
 

 A checking account was opened in the name of the corporation with the plaintiff bank. A copy of the resolution (described above) of the board of directors was delivered to the bank as evidence of Clark’s authority on his signature alone to issue checks on behalf of the corporation. The bank, however,- demanded a co-signer on the checks. Accordingly, Mrs. Rolen was designated as the officer to co-sign the checks.
 

 Clark also owned another business known as the Pineville Supply Company. He had borrowed money from time to time from the plaintiff bank. These loans were to be repaid by Clark or Pineville Supply, but were not in any way obligations of the corporation.
 

 The trustee in bankruptcy claimed that between April 4 and August 4, 1968, while Clark was managing the business of the corporation, six checks were drawn on the accounts of the corporation in the plaintiff bank, and that all the checks were made payable to the bank, and that all or part of the proceeds were applied to the payment of debts owed by Clark in his personal capacity to the bank. The trustee takes the position that the bank is obliged under the Uniform Fiduciaries Act (R.S. 9:3801 et seq.) to refund to him the proceeds of the checks which were applied to Clark’s debt.
 

 The checks were follows:
 

 April 4, 1968 April 9, 1968 May 15, 1968 July 8, 1968 July 19, 1968 August 4, 1968 $4,060.37 502.81 195.02 195.02 250.00 7,833.79
 

 Out of this amount, $12,502.41 was applied toward payment of debts which Clark individually owed the bank.
 

 
 *1181
 
 All six checks were signed hy Clark and co-signed by Mrs. Rolen. Mrs. Rolen testified that Clark would bring her checks to be signed before the payee’s name was placed in the blank. He would state that he did not know the concrete dealer’s name, and that was why the payee’s name was blank. She said that she never cosigned a check which was drawn on the corporation’s account and payable to the plaintiff bank. It was conceded by all parties that the bank was never informed that Mrs. Rolen had signed any of the checks in blank before they were completely filled out and that the bank had no knowledge that she had done so. Evidence also established that the bank had mailed monthly statements to the corporation along with the canceled checks. Mr. and Mrs. Rolen testified that they never saw the canceled checks nor statements, the implication being that Clark received them and never showed them to the Rolens.
 

 The Court of Appeal held that the plaintiff bank was justified in assuming that the officers of the corporation saw the statements which were delivered monthly. Mr. Rolen testified that he trusted Clark until May, 1968 when he began to get suspicious because Clark procrastinated in showing him the bank statements. Ultimately, Rolen employed an accountant who discovered the misappropriation of corporate funds on about August 19, 1968. Mrs. Rolen corroborated her husband’s testimony, but added that she did not become suspicious of Clark until July, 1968. Citing the Uniform Fiduciaries Act, the court held that one of the fiduciaries who participated in the drawing and delivering of the checks (Mrs. Rolen) did not breach her obligation as a fiduciary and accordingly the plaintiff bank was not liable. It therefore reversed that part of the trial court’s award o’f $12,502.41 to the trus.tee in bankruptcy. See 241 So.2d 14.
 

 This court granted writs of review. See 258 La. 703, 247 So.2d 583.
 

 The Uniform Fiduciaries Act, R.S. 9:3801 et seq., and more specifically R.S. 9:3805 and 3808, disposes of this case; they provide:
 

 “If a check or other bill of exchange is drawn by a fiduciary as such or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is payable to a personal creditor o'f the fi
 
 *1183
 
 dudary and delivered to the creditor in payment of, or as security for, a personal debt of the fiduciary, to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument.” R.S. 9:3805.
 

 “If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal’s account the bank is authorized to pay any such check without being liable to the principal, .... If, however, such a check is payable to the drawee bank and is delivered to it in payment of, or as security for, a personal debt of the fiduciary to it, the bank is liable to :he principal, if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.” R.S. 9:3808.
 

 This court has never been called upon to interpret these provisions.
 
 [1]
 

 Since the Uniform Fiduciaries Act is a uniform law originally drafted in 1922 (R. S. 9:3801 et seq.), it is appropriate for us to look to the interpretation of that law in other courts.
 

 In Maryland Casualty Company v. Bank of Charlotte, 340 F.2d 550 (4th Cir. 1965), plaintiff-appellant was the subrogee of the Southern Investment Company to whom an employee fidelity bond had been issued on a Miss Ewing. Southern’s board of directors had adopted a resolution in 1955 permitting any two of its three named officers to enter into banking transactions with the defendant bank. The resolution also absolved the bank ’from any inquiry that would arise from transactions therein described. In 1958, Southern employed Miss Ewing as a new corporate secretary. She obtained a blank form like the 1955 resolution and asked the other directors whether she should fill it out and substitute her name for that of her predecessor. Permission was granted. She then added her name as one of the three authorized directors, and also provided that any one director could initiate the specified transactions. She signed the resolution as secretary of the company and recited that it had been adopted at the same time as the 1955 resolution. The document was presented to the defendant bank.
 

 
 *1185
 
 In 1959 Miss Ewing began to sign and submit checks to Southern’s president for his co-signature drawn on Southern’s accounts in other banks but payable to the defendant hank. Vouchers attached to the checks described them as transfer of funds or payment of corporate debts. Miss Ewing removed these vouchers before submitting them to the defendant bank for cashing, for crediting to her personal account, or for applying to her personal loans. Nineteen checks over a two and one-hal'f year period totaling over $18,000 were issued. Eventually the corporation discovered the loss and collected on its bond.
 

 The court held that the crediting of these checks to Miss Ewing’s account constituted either “actual knowledge” or “bad faith” under section 5 of the Uniform Fiduciaries Act. The court said (340 F.2d at 553-555):
 

 “If it is the former, [actual knowledge], the creditor is liable because from the circumstances it would necessarily have ‘actual knowledge’ that the fiduciary was misappropriating his principal’s funds. The Bank, having gained such ‘actual knowledge’ of a breach of a fiduciary obligation when it received the second check in the series and applied it in reduction of Miss Ewing’s personal debt, could not divest itself of its continuing knowledge of the faithlessness of the fiduciary. Not only did the alarm bell sound when the Bank received the second check but it kept on sounding for two and one-hal'f years as ten more checks were similarly applied in reduction of her debt. From this would follow that, while the Bank may have acted innocently in cashing the first check, it lost this innocence when the second check was received and used to pay Miss Ewing’s personal obligation. It then became liable to Southern for all the later checks in the series, whether the amounts were credited to Miss Ewing’s account or paid into her hand.
 

 “The Bank’s insistence that it never had ‘actual knowledge’ as that term is used in the U.F.A. cannot prevail. It asserts that Miss Ewing’s use of the corporate check designating the Bank as payee to pay her personal debt did no more than put the Bank on notice that something was wrong.
 
 [5]
 
 It suggests that the possi-
 

 bility always existed, though its improbability is conceded, that the checks were given to Miss Ewing by Southern for her personal use.
 

 “Even if we were to accept the Bank’s argument that it lacked ‘actual knowledge,’ it still would not escape liability,
 
 *1187
 
 for this would be to overlook the plain language of section S of the U.F.A., quoted in footnote 1. That section, after laying down the requirement of ‘actual knowledge’ of a breach or ‘bad faith,’ declares liability on the part of a creditor who consciously applies such an instrument to its debtor’s benefit. Such conduct is by the statute explicitly made a basis of liability without stopping to categorize it as ‘actual knowledge’ or ‘bad faith.’ From this we derive that the statute meant to excuse some lesser default than ‘actual knowledge’ or ‘bad faith,’ and that the statutory illustration of liability forcefully implies that such conduct as that in which this Bank engaged constitutes, in the contemplation of the statute, either ‘actual knowledge’ or ‘bad faith.’
 

 ******
 

 “ . . . The ‘bad faith’ test was borrowed from the Uniform Negotiable Instruments Act. Paine v. Sheridan Trust & Savings Bank, 342 Ill. 342, 174 N.E. 368 (1931). The standard used in construing the term under that Act has not been evil motive. Instead courts have asked whether it was ‘commercially’ unjustifiable for the payee to disregard and refuse to learn facts readily available. Taylor v. Citizens Bank, 290 Ky. 149, 160 S.W.2d 639 (1942). At some point, obvious circumstances become so cogent that it is ‘bad faith’ to remain passive.
 

 * * *
 
 *
 
 * *
 

 “ . . . The Bank’s personnel had before their eyes clear evidence of a probable misappropriation. The Bank was both witness and participant when it began receiving corporate checks and applying them to Miss Ewing’s private debt. Thus, from that date, it had the knowledge requisite for liability. It is noteworthy that, like the bank in the Pennsylvania case, the Bank here had a monetary interest in not notifying Southern since an investigation would jeopardize the flow of repayments on Miss Ewing’s personal debt.
 

 “Giving the Bank the benefit of the most favorable construction of the statute, we hold that it is not liable for cashing the first check in the series and paying the proceeds, amounting to $2,100.00, to Miss Ewing. The mere fact that the Bank was designated as payee was not enough to attribute to it either ‘actual knowledge’ of ‘bad faith.’ The Bank, however, did act in ‘bad faith,’ even if it lacked ‘actual knowledge,’ when it received the second check in the series and credited the proceeds to the fiduciary’s debt in direct violation of the express statutory provision. This ‘bad faith’ carried over to each of .the remaining checks in the series, making it liable, for
 
 *1189
 
 $16,013.75.” (Footnotes generally omitted).
 

 See also Union Bank & Trust Co. v. Girard Trust, 307 Pa. 488, 161 A. 865 (1932).
 

 We find the facts and law in the case before us basically indistinguishable from the Maryland Casualty case. Here two directors of the corporation had to sign each check. Clark fraudulently induced Mrs. Rolen to sign the checks in blank. Thereafter, he inserted the name of the plaintiff bank as the payee and applied the checks to his personal debts with the plaintiff bank. The bank statements of the corporation were concealed by Clark from the Rolens; hence, the Rolens had no knowledge of what was going on. Like the president of Southern in the Maryland Casualty case, Mrs. Rolen signed the checks in good faith. And as in the Maryland Casualty case, one party used the checks to satisfy personal debts to the bank. The plaintiff bank had knowledge that the corporation’s funds were being used to satisfy an individual’s personal debt, and such knowledge constituted “actual knowledge” and “bad faith” within the specific meaning of R.S. 9:3805.
 

 But unlike the Maryland Casualty case, we find that the plaintiff bank was in bad 'faith within the meaning of R.S. 9:3805 and 3808 when it received the first check because it was
 
 both
 
 the drawee bank and payee of the check. The bank had before it clear evidence of a probable misappropriation. Therefore, we hold that the bank at that point had a duty to inquire as to the validity of these payments.
 
 [2]
 

 Plaintiff argues that when there are two fiduciaries, the act does not apply. There is no merit to the contention for four reasons. First, plaintiff cites Chehardy v. Democratic Executive Committee, 259 La. 45, 249 So.2d 196 (1971) to support the proposition that “a” means “one.” The case is not apposite. Nor is Fidelity & Casualty Co. of New York v. United States Fidelity & Guaranty Co., 81 So.2d 576 (La.App.1955) applicable because there the court was interpreting the Negotiable Instruments Law. Second, the Maryland Casualty case involved two fiduciaries. Third, no reason has been discovered to relieve a payee-creditor of liability when there are two fiduciaries breaching obligations, and imposing liability when there is one fiduciary breaching his obligation. And fourth, R.S. 9:3801 defines “fiduciary” to include “any other persons acting in a fiduciary relationship,” and defines “person” to include “two or more persons having a joint or common interest.” (Emphasis added).
 

 
 *1191
 
 We cannot say that Mrs. Rolen did not breach her obligation as a fiduciary when she signed the checks in blank. See, e. g., C.C. art. 3002 et seq.
 

 Both parties to this suit stipulated that the amount of the funds involved on the six checks was $12,502.41. That part of the judgment on the promissory note was not in issue. It is therefore ordered and adjudged that the judgment of the Court of Appeal be reversed in part insofar as it reversed the trial court, and that the judgment of the trial court is reinstated and made the judgment of this court, at plaintiff’s cost.
 

 Reversed in part and affirmed in part.
 

 TATE, J., recused.
 

 [1]
 

 . See Comment, Good Faitli in the Uniform Fiduciaries Act, 9 Tul.L.Rev. 618. The writer there notes that certain provisions of the Uniform Fiduciaries Law impose absolute liability on the transferee when a personal tlebt is satisfied witli fiduciary funds.
 

 [5]
 

 We note without comment that some courts impose more stringent rules on banks dealing with corporate officers than on banks dealing with fiduciaries of the trustee type. Wagner Trading Co. v. Battery Park National Bank, 228 N.Y. 37, 126 N.E. 347, 9 A.L.R. 340 (1920); Note, 16 Va.L.Rev. 401, 404 (1930).
 

 [2]
 

 . The official comment to section 8 of the Uniform Fiduciaries Act states in part: “But •when the check is payable to the depository bank and delivered in payment of or as security for a personal debt of the fiduciary, tbe bank is put upon inquiry.”