422 So.2d 1217 (1982)
Janice Campbell EDWINS, et al.
v.
Roy M. LILLY, Jr., et al.
CONSUMER CREDIT CORPORATION, et al.
v.
Roy M. LILLY, Jr., et al.
Nos. 15074, 15075.
Court of Appeal of Louisiana, First Circuit.
October 12, 1982.
Rehearing Denied December 16, 1982.
Writs Denied February 4, 1983.
*1218 R.C. Edwins, Baton Rouge, for Janice Campbell Edwins.
Henry O'Connor, Jr., New Orleans, for Consumer Credit Corp.
*1219 Roy M. Lilly, Jr., in pro. per.
Anthony J. Clesi, Jr., Baton Rouge, Richard F. Knight, Bogalusa, Lawrence R. Anderson, Baton Rouge, Dale E. Branch, Bogalusa, France W. Watts, III, Franklinton, Kenneth E. Barnette, Baton Rouge, H.F. Foster, New Orleans, for Roy M. Lilly, Jr., et al.
Before CARTER, SAVOIE and SHORTESS, JJ.
CARTER, Judge.
Plaintiff, Consumer Credit Corporation in Liquidation filed suit against Roy M. Lilly, Jr., Jim W. Richardson, Jr., Robert Morton Roche, and Washington Bank & Trust Company, seeking to recover funds allegedly misappropriated during the liquidation of Consumer.[1] Plaintiff appeals from a judgment in its favor against Lilly only and which dismissed its claim against Richardson and the Bank. The judgment also dismissed all third party demands and the claim against Roche as barred by the bankruptcy laws.
Plaintiff was a commercial lending institution operating in Washington Parish, Louisiana, and the State of Mississippi. Hal J. Hendricks, Sr., L. Rowe Davidson, and Roche[2] (one of the defendants) acted as its "executive committee" during all times relevant to the negotiations of the sale of its assets to Allstate Credit Plan, Inc., and during the development of a plan of liquidation. In July, 1972, the shareholders of Consumer voted to place it in non-judicial liquidation contemporaneously with the sale to Allstate.[3] In the resolution authorizing liquidation, Richardson was appointed liquidator of Consumer. Lilly of (Richardson & Lilly) was to act as counsel for Consumer during its liquidation. The sale price of the assets of Consumer was $2,088,335.00 ($2.50 per share for common stock), which was calculated to retire all outstanding long-term debts.[4]
According to the plan of liquidation, the liquidator was to pay the long-term debts immediately upon presentation to him of the notes and bonds representing them and to distribute to the shareholders 90% of the price of each share ($2.25) upon presentation of the certificates. The remaining 10% of the value of the stock ($208,833.50) was *1220 to be retained by the liquidator for a year as a reserve against contingent liabilities. This reserve fund was to be held in the form of a certificate of deposit.[5]
At this time Jim W. Richardson, Jr. and Roy M. Lilly, Jr. practiced law together in Bogalusa under the partnership name of Richardson & Lilly,[6] and for some time prior to the sale and liquidation had represented Consumer, the Bank, Hendricks and Roche in various legal matters. There were no written articles of partnership defining their business relationship, although Richardson and Lilly held themselves out to the public as a professional law partnership, with each of them performing law firm business. They shared equally in the profits and expenses, and for all apparent purposes operated as a traditional small-town two-man law partnership, with each of them more or less devoting his time mainly to clients he considered "his client", but handling matters for each other as the occasion demanded. St. Paul Fire and Marine Insurance Company was the professional liability insurer of the law firm of Richardson & Lilly and each of the partners.
On the night of July 19, 1972, Allstate delivered to Lilly the sale price for the assets of Consumer. Lilly placed the money in the night depository of the Bank's branch office in Bogalusa. The next day, Lilly opened two separate checking accounts and purchased a certificate of deposit from the Bank. First, Lilly opened the Consumer Credit Corporation Liquidator's Account and deposited in this account the sale price received from Allstate. A portion of the funds in this account was then used to buy the certificate of deposit # 4503 in the amount of $208,833.50. Next, Lilly opened the second account, the Richardson & Lilly Special Escrow Account.[7] These accounts were in addition to the existing law firm accounts at the Bank and at another bank in the parish. Authorized signatories on the liquidator's account were Richardson and a secretary of the law firm, Carolyn Cesario. Lilly and Ms. Cesario were authorized to sign on the special escrow account. Both Richardson and Lilly were authorized to sign checks drawn on the firm's operating accounts. The initial deposit in the special escrow account was a check from the law firm in the amount of $1,000.00. On that same day, July 20, 1972, Lilly forged the liquidator's signature to a check in the amount of $100,000.00 drawn on the liquidator's account, and deposited this amount in the special escrow account. Also, on July 20, 1972, two checks were drawn on the special escrow account in the amounts of $13,640.04 and $15,270.29, to the order of the Bank to pay certain mortgages held by the Bank on certain properties which had been transferred by notarial acts passed before Lilly as notary public, but for which he had retained the funds, rather *1221 than paying off the mortgages. These mortgage payoffs were but the first of several such pay-offs to the Bank from the special escrow account, totalling $125,835.45, and for which no corresponding deposits were made into the account.
By September 18, 1972, the liquidator's account had been depleted, and there were still outstanding unsatisfied claims which had to be paid under the plan of liquidation. In order to cover this shortage, Lilly forged Richardson's name to a letter dated September 18, 1972, requesting the transfer of $50,000.00 from the certificate of deposit to the liquidator's account. This payment from the certificate of deposit, having been requested in advance of the stated maturity date, required the authorization of an officer of the Bank. Roche authorized this transfer of funds. The requested amount was transferred into the liquidator's account, and a new certificate of deposit (# 4602) was issued in the amount of $159,216.13. The new certificate was backdated to July 20,1972, for the purpose of allowing Consumer to earn interest from that date.
By December 22, 1972, the special escrow account was overdrawn in the amount of $175,612.52. To cover these overdrafts Lilly forged Richardson's name to a check on the liquidator's account for the sum of $183,537.06. Since the balance of the liquidator's account was insufficient to cover this check, Lilly also forged Richardson's name to a letter dated December 22, 1972, requesting the transfer of the proceeds represented by the certificate of deposit # 4602 to the liquidator's account. These funds were then transferred from the liquidator's account to the special escrow account. Roche authorized payment of certificate of deposit # 4602 in advance of its stated maturity date and handled the deposit of the check from the liquidator's account to the special escrow account.[8]
In this suit plaintiff seeks to recover from Lilly, Richardson, Roche, and the Bank, the money that was misappropriated. The trial court found that Lilly was responsible for the misappropriation and thus liable to the plaintiff. The trial court considered Richardson to be merely a "nominal liquidator," and thus not liable; Roche to be an adjudicated bankrupt, whose liability was pretermitted; the Bank to have no knowledge of the forgeries or the misappropriation of the funds involved in the lawsuit, and not to have been in bad faith nor to have had actual knowledge of Richardson's breach of duty, and thus not liable under the Uniform Fiduciaries Act (LSA-R.S. 9:3801 et seq).
Plaintiff has perfected this appeal and seeks reversal on three basic grounds: first, appellant contends that it was error to find that Richardson (as liquidator) did not breach his fiduciary duty to Consumer; second, appellant contends that it was error to find that the Bank was not liable under the Uniform Fiduciaries Act and not liable for having honored forged instruments; and third, appellant contends that it was error to find that St. Paul was not liable under its professional liability policy insuring Lilly, Richardson, and the law partnership of Richardson & Lilly.

LIABILITY OF RICHARDSON
We have carefully scrutinized this lengthy record and conclude that the evidence in the record does not support the trial court's finding that Richardson was merely a "nominal liquidator." He was duly selected and appointed as liquidator of this corporation, and he accepted that trust. The record also does not support the finding that Richardson acted with the diligence, care, judgment and skill which an ordinarily prudent man would have exercised under the circumstances of the instant case.
*1222 The standard of conduct expected of a liquidator in the performance of his duties is expressed in LSA-R.S. 12:145(G), as follows:
"In the performance of his duties, each liquidator shall be bound to exercise that care and prudence in the listing, custody, possession, control and disposition of the property and moneys of the corporation coming into his hands, and in the proper accounting therefor, and distribution thereof, as by law is imposed upon fiduciaries."
Moreover, during the liquidation process, all of the rights, powers and duties of corporate officers are vested in and imposed on the liquidator, LSA-R.S. 12:141(C); Noe v. Roussel, 310 So.2d 806 (La.1975).
In Noe, the Supreme Court held that there was a fiduciary relationship between the liquidator and shareholders of a corporation. The Court reasoned that when a corporation was placed in liquidation, the duties and powers of the former corporate officers and directors devolved upon the liquidator; hence, he was obligated to conduct himself in the same manner as are officers and directors. The standard of care exacted of corporate officers and directors is expressed in LSA-R.S. 12:91, as follows:
"Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions...."
The record does not reflect that Richardson took any steps toward actually discharging the duties of his office. There is no evidence that he even made any inquiry of Lilly, his law partner, who was also counsel for the corporation in liquidation, about the status of the liquidation process. He seems to have been content to let his law partner run the whole show; even though, as an attorney himself, he knew that as liquidator he had certain duties and obligations, and that he was not performing or meeting them. Richardson testified to his activities, or lack thereof, as liquidator. He never looked at a bank statement. He never checked a bank balance. As the liquidation continued, presumably toward termination, he never inquired as to its status. He delivered all mail addressed to him (as liquidator) to Lilly, unopened and unread. From the beginning to the end he completely ignored the duties and obligations incumbent upon him as liquidator.
Counsel representing the liquidator appropriately refers to Richardson's interest in the liquidation process as a "passing awareness." Unfortunately for Mr. Richardson the law demands more of a liquidator than such slight attention to the affairs of his trust. The law does not permit a liquidator to stand insouciantly on the sidelines while the liquidation is being frustrated or frittered away. The liquidator must actively be involved in the administration of his trust. He is the fiduciary to the corporation in liquidation, its shareholders and its creditors. As fiduciary, his duty is of the highest obligation required by law. He must "zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever." Noe v. Roussel, supra at 819. If Mr. Richardson did not care to perform the duties of liquidator, he should have resigned his position. By remaining as liquidator without fully performing the duties required of him, he failed to prudently handle the affairs of the corporation in liquidation. His failure in this respect is one of the primary reasons Lilly was able to so easily steal the funds of Consumer (the other reason being the cooperation of Roche). As liquidator, Mr. Richardson *1223 failed to measure up to even the least minimum standard that one has a right to expect of a fiduciary. When Mr. Richardson was questioned about his performance as liquidator, the record reflects the following testimony:
"Q. During the period from July of '72 through July of '73, what actions did you take so far as monitoring the status of the funds of Consumer Credit Corporation in liquidation?
A. I don't believe I ever took any."
He cannot now claim that he was liquidator in name only. He was the only appointed liquidator. As such, it was incumbent upon him to perform the duties exacted of the liquidator. The fiduciary duties of the corporate liquidator are discussed in Todd Shipyards Corporation v. Lomm, 190 So.2d 125 (La.App. 4th Cir.1966), writ refused 249 La. 1022, 192 So.2d 370 (1966); and 204 So.2d 80 (La.App. 4th Cir.1967). As shown by the Todd decisions, the liquidator will be held liable for breach of his fiduciary duties. We thus find that it was error for the trial court to hold that Richardson was not liable for the breach of his fiduciary duty to Consumer.
We further point out that Richardson's argument that his appointment as liquidator was never operative because he failed to comply with LSA-R.S. 12:142(B) is without merit. See Todd Shipyards Corporation v. Lomm, supra.
LSA-R.S. 12:142(B) provides:
"B. The shareholders or incorporators authorizing the dissolution may authorize liquidation of the affairs of the corporation out of court, by appointment of one or more liquidators to conduct the liquidation, but the appointment shall not be operative until:
(1) Notice of authorization of the dissolution, stating that the corporation is to be liquidated out of court and giving the name and post office address of each liquidator, has been published at least once in a newspaper of general circulation in the parish in which the corporation's registered office is located, and a copy of such notice, with the affidavit of the publisher of the newspaper to the fact of such publication attached, has been filed with the Secretary of State; and
(2) A certificate that the dissolution has been authorized in accordance with this section, setting forth the manner of such authorization, has been signed by the president or a vice-president and the secretary or an assistant secretary of the corporation, acknowledged by one of the signing officers, and filed with the Secretary of State, who, after all fees and charges have been paid as required by law, shall record the same in his office, and endorse thereon the date of filing thereof with him."
The quoted statute is not designed to protect the liquidator; its purpose is to give proper notice to third persons dealing with a corporation that the corporation is in liquidation and is winding up its affairs. This Court is of the opinion that one who accepts the trust of liquidator and serves in the capacity of liquidator cannot rely on these technical provisions of the law to insulate him from liability for breach of his fiduciary duty.
Counsel for Richardson is in error when he argues that any cause of action which plaintiff may have against the liquidator would sound in tort, and is thus barred by LSA-C.C. art. 3536 establishing the liberative prescription of one year for such actions. The plea of one-year prescription is not good. The relation between Richardson as liquidator and the corporation in liquidation (and its shareholders) is a fiduciary relationship and his duty owed to them is a special duty, and not a general one due everybody. The prescription of ten years, not of one year, is applicable. Dawkins v. Mitchell, 149 La. 1038, 90 So. 396 (1922); Pool v. Pool, 16 So.2d 132 (La.App. 1 Cir.1943).

LIABILITY OF THE BANK
Our careful study of the record convinces us that the trial court was in error in not finding that the Uniform Fiduciaries Act, LSA-R.S. 9:3801 et seq., was applicable to the situation at hand so as to hold the Bank liable to Consumer.
*1224 The pertinent section of the Uniform Fiduciaries Act is LSA-R.S. 9:3807, which provides:
"If a deposit is made in a bank to the credit of the fiduciary as such, the bank is authorized to pay the amount of the deposit or any part thereof, upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check; or with the knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such check is payable to the drawee bank and is delivered to it in payment of, or as, security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check."
Under the Act for plaintiff to recover it was necessary to show that the Bank had "actual knowledge" of the misappropriation or was in "bad faith" in handling transactions by which the misappropriation occurred. The Act also permits recovery if checks were payable to the Bank and delivered to it in payment of, or as security for, personal debt of the fiduciary to it where there was a breach of fiduciary obligation. We find that the evidence establishes facts that can only lead to the conclusion that the Bank (through Roche) had actual knowledge the funds belonging to Consumer were being misappropriated and that the Bank (through Roche) was in "bad faith" with regard to those transactions.
At the time of the institution of the lawsuit, there were no funds remaining to the account of Consumer. The record reflects that through forgeries and misappropriations, funds belonging to the corporation in liquidation were diverted to the special escrow account, a substantial portion of the funds being paid to the Bank for debts of the law firm (or Lilly or Richardson, individually).[9] Lilly has admitted his own actions in connection with the forgeries and misappropriations.[10] The evidence in the record clearly establishes the complicity, cooperation and collaboration of Roche with Lilly.
The record establishes a long-standing personal and business relationship between Lilly and Roche which had existed prior to and throughout the course of Lilly's actions. Roche depended upon Lilly to handle gambling debts for him and to advance large sums of cash to him far beyond Lilly's apparent means and without any documentation. Roche was charged with supervision of the Bank office at which all of Consumer's transactions were conducted. Roche personally handled many of them, including the most critical. Roche supervised Lilly's accounts at the Bank and allowed almost constant substantial overdrafts to exist. As a member of the executive committee for Consumer and as a Bank executive officer, Roche was singularly well-equipped to recognize the impropriety of the account manipulations and the early redemptions of the certificate of deposit and he was obviously in a position "to question" the transfer of funds from the liquidator's account and the early redemptions of the certificate of deposit. Rather than preventing the misappropriations, Roche continued to support Lilly's public representations that the *1225 liquidation was in order, that the escrow was secure in the Bank, and that the shareholders could expect their money soon. The inescapable conclusion is that Roche knew of the manipulations of Consumer's accounts by Lilly.
We believe the observation made by the Court in Lilliedahl & Mitchel, Inc. v. Avoyelles Trust & Savings Bank, 352 So.2d 781, 787 (La.App. 3 Cir.1977), is pertinent herein:
"Looking to the facts and circumstances of this case, we note at the outset that this is a suit against a bank involving large sums of money. Banks stand in a peculiarly unique place in the business world. They are entrusted with huge sums of money by their depositors and must proceed cautiously when dealing with deposited sums. We also note that it is axiomatic that a corporation can only act through individuals and these individuals must be given legal power to act on behalf of a corporation. Furthermore, the resolution in this case was very detailed as to the type of transactions in which Lilliedahl was authorized to act. We feel that the Bank should proceed cautiously when applying corporate funds entrusted to the Bank to the personal debt of a corporate officer, especially when large sums of money are involved, and that some form of specific corporate authorization should be required."
(Emphasis added.)
The Bank through Roche did not "proceed cautiously" in dealing with the several accounts involved, the mortgage pay-offs and the certificates of deposit. On the contrary, the Bank through Roche proceeded most dangerously, giving Lilly carte blanche to manipulate his personal transactions, his law firm's and law partner's transactions, Consumer's transactions, Roche's transactions and the liquidator's transactions as Lilly willed. We feel the Bank should have proceeded most cautiously when allowing the liquidator (or Lilly through forged papers) to prematurely redeem two certificates of deposit (on two occasions) and channel the funds through the liquidator's account into a special escrow account (not belonging to Consumer), especially when large sums of money were involved. The Bank's knowledge through Roche concerning the uses to which the accounts were being put, the situation surrounding the premature redemption of two certificates of deposit, and the involvement of Lilly rather than the liquidator, Richardson, in the liquidation process, constituted actual knowledge that Richardson was breaching his fiduciary relationship with Consumer within the contemplation of LSA-R.S. 9:3807.
The essence of the relationship between Roche and Lilly is distilled in Lilly's final response to a line of questioning on direct examination regarding the manner of their personal dealings:
"(We knew that) ... there would be no problems because we did stuff all of the time where it was not strictly according to sound banking practices and it was handled and there was no problem. Morton (Roche) was a forerunner of Bert Lance"

(Emphasis added).
The Bank through Roche was fully aware of the transfers and transactions between the special escrow account and the liquidator's account, and the redemption of the certificate of deposit. In fact, Roche actively participated in some of them. The Bank had before it clear evidence of misappropriation. Therefore, we hold that the Bank is liable to Consumer under the Uniform Fiduciaries Act. Guaranty Bank & Trust Company of Alexandria v. C & R Development Company, Inc., 260 La. 1176, 258 So.2d 543 (1972).
The record establishes that there were eight checks drawn on the special escrow account to the order of the Bank in satisfaction of mortgages held by the Bank on the properties previously sold by notarial acts passed before Lilly in connection with which Lilly had received funds to pay off these mortgages, but had retained the funds in his already overdrawn operating account. The checks totalled $125,835.45 for which no corresponding deposits were made to the special escrow account or to the *1226 liquidator's account. The Bank was fully aware of these transactions, being both payee and depository of all of the funds involved. The fiduciary checks from the liquidator's account were forgeries obvious to the Bank since it had on record the valid signatures of all concerned.
We note that the Bank offered no testimony on its good or bad faith, other than that of Mr. Roche to the effect that he saw nothing wrong in all of the activity involving Lilly and the various accounts and the lack of response from Richardson (who he knew was the liquidator). This Court observed in Charles Ragusa & Son v. Community State Bank, 360 So.2d 231, 234 (La. App. 1 Cir.1978):
"Considering this burden on a bank seeking the protection of the statute, we do not believe that it is sufficient for a bank merely to utter the conclusionary allegation of good faith. On the contrary, when a bank's actions are put at issue, it is incumbent upon the bank to show that it exercised the requisite care with regard to its customer. This the bank has failed to do in the instant case. In fact, the bank did not introduce any evidence in support of its actions or to prove its alleged good faith."
Under the circumstances, even if we accept Roche's testimony at face value, we find that it was commercially unjustifiable for the Bank to disregard and refuse to learn facts readily available. "At some point, obvious circumstances become so cogent that it is `bad faith' to remain passive." Maryland Casualty Company v. Bank of Charlotte, 340 F.2d 550, 554 (4th Cir.1965).
The record establishes that the Bank's dealing with Consumer in the redemption of the certificate of deposit and the various transfers from the liquidator's account to the special escrow account and to the Richardson & Lilly firm account fall within the class of dealings contemplated by LSA-R.S. 9:3807. That being the case, the breach of fiduciary duty of Richardson having been shown and the actual knowledge (and also bad faith) of the Bank having been proven, the Bank is liable to Consumer for its loss.
We also find that the evidence establishes that the liquidator's forged checks (which the Bank through Roche knew to be forged) were delivered to the Bank in payment of personal debts of the law firm (and, thus, Richardson) constituting another ground for breach of the fiduciary obligation. LSA-R.S. 9:3807.

LIABILITY OF ST. PAUL
Consumer urges this court on appeal to render judgment in its favor against St. Paul Fire and Marine Insurance Company, liability insurer of Richardson. Consumer filed no proceedings whatsoever making St. Paul a defendant in this proceeding. Nor did Richardson file any proceeding either directly or by third-party petition making St. Paul a defendant or third-party defendant. Therefore, the liability of St. Paul to Consumer or Richardson is not before this Court.
For the reasons assigned, this Court reverses the judgment of the trial court in favor of Jim Warren Richardson, Jr. and Washington Bank & Trust Company and finds Jim Warren Richardson, Jr. and Washington Bank & Trust Company liable, jointly and in solido, for the full sum of $208,833.50, together with legal interest thereon from the date of judicial demand until paid, and all costs of these proceedings. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
NOTES
[1] On October 23, 1975, Consumer Credit Corporation instituted proceedings entitled "Consumer Credit Corporation vs. Roy Lilly, Jr., Jim Warren Richardson (Jr.), Robert Morton Roche and Washington Bank & Trust Company," under docket number 39,747-C of the Twenty-second Judicial District Court, Parish of Washington, Louisiana. On October 24, 1975, the proceedings were consolidated with the proceedings entitled "Janice Campbell Edwins, et al. vs. Roy Lilly, Jr., Jim Warren Richardson (Jr.), Robert Morton Roche and Washington Bank & Trust Company, "under docket number 38,657-B of the Twenty-second Judicial District Court, Parish of Washington, Louisiana."
[2] Roche was an executive officer of Washington Bank & Trust Company (and manager of the branch in Bogalusa) and an executive officer of Consumer Credit Corporation.
[3] A special meeting of Consumer shareholders was held on July 17, 1972. At this meeting the shareholders adopted a plan of liquidation, and agreed to sell the corporate assets to Allstate for $2,088,335.00. By resolution, Richardson was appointed liquidator. Lilly formulated the plan of liquidation, prepared all of the necessary documents and arranged the special meeting. According to the plan, approximately 90% of the funds received from Allstate were to be immediately disbursed to the shareholder. A reserve (not to exceed 10% of the sale price) was to be retained (in a certificate of deposit) to meet contingent liabilities of Consumer. As part of the plan, Consumer was to be completely liquidated within one year for tax purposes.
[4] Immediately following the sale, a checking account, "Consumer Credit Corporation Liquidator's Account," was opened at the Bank, and this amount was deposited in the account.
[5] A check for $208,833.50 was drawn on the Bank on the liquidator's account for the issuance of certificate of deposit # 4503, bearing interest at the rate of 7% per annum and maturing in one year.
[6] It appears that each partner had a separate Richardson & Lilly legal or operating account as well as separate firm escrow accounts, and that for business purposes, these accounts were kept at different banks in the parish.
[7] Subsequent to the opening of these two accounts large sums of money were periodically transferred from the liquidator's account to the special escrow account. From July 20, 1972 to December 26, 1972, numerous checks were written to the various shareholders and bondholders, and funds were transferred among the several accounts for the purpose of paying these obligations. The evidence shows that some of these payments were made by checks issued by Richardson, but the majority of the disbursements from these accounts were made by Lilly. In addition to paying obligations under the plan of liquidation, several checks were drawn to the order of the Bank in satisfaction of mortgages held by the Bank for which Lilly was obligated.
[8] Apparently, Lilly and Roche handled this entire series of transactions without consulting or confiding in Richardson.
[9] A corporate officer (liquidator) has no authority in the absence of a specific corporate resolution to pay from corporate funds the personal debts of a corporate officer or any third person. First National Bank of Ruston v. Pine Belt Producers Co-op, 363 So.2d 1201 (La.App. 2 Cir.1978), writ denied, 365 So.2d 262 (La. 1978); Lilliedahl & Mitchel v. Avoyelles Trust & Savings Bank, 352 So.2d 781 (La.App. 3 Cir.1977).
[10] Lilly confessed his crime to federal and state authorities in July of 1974, and he resigned from the Louisiana State Bar Association in August of 1974.