TRENTON TRUST COMPANY,
Appellant,

v.

WESTERN SURETY COMPANY, Nancy
Hook and Kenneth R. Lewis, Guardian
of the Estates of Norman C. Bruner, Jr.,
and Karen L. Bruner, Minors, Respondents.

No. 61717.

Supreme Court of Missouri,
En Banc.

May 13, 1980.

As Amended on Court's Own Motion and
Rehearing Denied June 10, 1980.

Louis F. Cottey, Thomas R. Oswald, Kirksville, for appellant.

Erwin L. Milne, Trenton, for respondents.

WELLIVER, Judge.

Appellant Trenton Trust Company seeks a declaratory judgment that security agreements and collateral pledge agreements made with respondent Nancy Hook are valid and entitle appellant to retain two certificates of deposit pledged by respondent Hook as collateral for a loan to her and her husband. The trial court found that when appellant accepted the certificates of deposit as security for loans to respondent Hook and her husband, it acted with knowledge that the certificates of deposit were purchased with fiduciary funds and that in accepting the certificates as collateral for a loan to respondent Hook in her personal capacity, appellant acted with knowledge that the transaction involved a misappropriation of fiduciary funds. The court also found that appellant acted with knowledge of such facts that its participation in the transaction constituted bad faith. The trial court held that the collateral pledge agreements were invalid, and ordered the appellant to deliver the certificates of deposit to the successor guardian of the estates of Norman C. Bruner, Jr., and Karen L. Bruner. We agree with the findings and conclusions of the trial court, and affirm its judgment.

There is conflicting evidence in the record concerning crucial questions of fact. Under Rule 73.01.3(a) and (b), our review in this court-tried case is "upon both the law and the evidence as in suits of an equitable nature," giving "[d]ue regard . . . to the opportunity of the trial court to have judged the credibility of witnesses." The judgment of the trial court should be affirmed "unless there is no substantial evidence to support it or it is against the weight of the evidence or it erroneously declares or applies the law." *McGee v. St. Francois County Savings and Loan Association*, 559 S.W.2d 184, 186 (Mo. banc 1977); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy*, 536 S.W.2d at 32. Conflicts in the evidence were for the trial court to resolve, and the facts must be taken in accordance with the result reached by the trial court. *Bollinger v. Sigman*, 586 S.W.2d 773, 775 (Mo.App. 1979); *B & B Equipment Co. v. Bowen*, 581 S.W.2d 80, 85 (Mo.App.1979). The trial court, when sitting as the trier of fact, may believe all, part or none of the testimony of any witness. *Cockrum v. Cockrum*, 550 S.W.2d 202, 205 (Mo.App.1977); *Long v. Lincoln*, 528 S.W.2d 512, 513 (Mo.App.1975). Accordingly, the statement of facts which follows treats the evidence in a light most favorable to the judgment of the trial court, and defers to the judgment of the trial court on matters in which the evidence is in conflict.

Respondent Nancy Hook was married to Donald Hook and was the mother of minor children by a previous marriage, Karen L. and Norman C. Bruner, Jr. In June of 1974, Norman C. Bruner, Sr., ex-husband of respondent Hook and the father of the children, was killed in an automobile accident in Illinois. Respondent Hook learned that her children would receive, from Equitable Life Assurance Society of the United States (hereinafter, "Equitable"), proceeds from a group insurance policy on her ex-husband's

life. Respondent Hook's attorney, Max Humphreys, advised her that the probate court would have to set up a guardianship for the minor children before the insurance company would issue checks in settlement of the claim for life insurance proceeds. Bond was approved in the amount of $12,000 for the estates of each of the minor children and respondent Western Surety Company issued its guardianship bond in the principal amount of $12,000 in both estates on November 4, 1974. On November 7, 1974, the Probate Court of Grundy County issued letters of guardianship, naming Nancy Hook as guardian of the person and estate of each of the two children. Phyllis Robinson and Michael Flieg were appointed to appraise the minors' estates. Ms. Robinson was at that time an Assistant Trust Officer of appellant Trenton Trust Company, but her appraisal of the minors' estates was done as an individual. She was neither directed to perform the appraising service nor paid for the service by appellant Trenton Trust Company.

Mr. Humphreys sent the letters of guardianship to Equitable, and on January 7, 1975, Equitable sent to respondent Hook two checks, each in the amount of $12,228.82. Each of the checks was made payable to respondent Hook as guardian of the estate of one of the two minor children. Mrs. Hook received the checks on Saturday, January 11, 1975, and on the following Monday, January 13, 1975, she took them to her attorney's office for instructions.

Mr. Humphreys gave respondent Hook copies of the letters of guardianship, and instructed her to take the letters and the two checks to the bank, and to invest the funds in guardianship accounts. Because Mr. Humphreys knew Mrs. Hook planned to invest the funds in appellant Trenton Trust Company, he instructed her to speak to George Constant, a Vice President and Trust Officer of appellant. Mr. Humphreys instructed respondent Hook to place the bulk of the money in long term certificates, and to place approximately a thousand dollars from each of the checks in savings accounts so that funds would be readily available to pay expenses of administration.

Respondent Hook went to Trenton Trust Company on January 13, 1975, and asked to speak with Mr. Constant. Finding that Mr. Constant was not at the bank, Mrs. Hook instead conducted the transaction with Charles Patterson, then Assistant Secretary (now a Vice President) of Trenton Trust Company. Patterson worked as a loan officer for appellant and was engaged primarily in making commercial and personal installment loans.

Respondent Hook and her second husband had a speaking acquaintance with Charles Patterson dating back several years. Mrs. Hook and Mr. Patterson were on a first-name basis. Throughout their testimony in the transcript, Mrs. Hook referred to Mr. Patterson as "Chuck," and Mr. Patterson referred to Mrs. Hook as "Nancy." The Hooks had procured several loans from appellant through Mr. Patterson, most of the loans between three hundred and five hundred dollars, and at least one vehicle loan of $3,000 to $5,000. Patterson did not at any time ask the Hooks for a financial statement nor did he require them to fill out a regular bank application for loans. Patterson testified that he had no in-depth knowledge of the Hooks' financial condition, other than his knowledge that "[t]hey had paid good on all the loans I'd made them."

Respondent Hook testified that she had talked to Patterson about her kids several times before January of 1975. Sometime in the late fall of 1974, while respondent Hook was conducting unrelated business at Trenton Trust Company, she told Patterson that the children would be receiving some life insurance proceeds soon that would need to be invested. In pre-trial depositions, she testified that she told Patterson that she was going to be appointed guardian of the kids by the court, and that the children would be receiving life insurance proceeds. She testified at trial that she told Patterson that she would have to go to court and that "there would have to be a guardianship set up before the money would come."

When Hook brought the life insurance checks to Patterson on January 13, 1975,

she did not state in so many words that she had been appointed guardian of the children, and she did not produce the copies of her letters of guardianship that Mr. Humphreys had given her. Patterson testified that Hook did not tell him that the money was for the benefit of her children. Respondent Hook testified that when she presented the insurance checks to Patterson on January 13, 1975, she told him that the money was for her children and that the checks represented insurance proceeds. Mrs. Hook testified that she specifically remembered mentioning her children to Patterson on January 13, 1975, because one of the reasons she chose to invest the insurance proceeds in certificates of deposit instead of in government bonds was that the certificates of deposit could be renewed relatively easily so that their dates of maturity could be made to coincide with the different dates that the two children would reach majority and become eligible to receive their money. Mrs. Hook concluded from the statements Patterson made on January 13, 1975, that he was aware that the funds invested in the certificates of deposit belonged to her minor children.

Patterson and Hook determined that $11,000 from each of the two checks would be placed in 48 month certificates of deposit and the $1,228.82 balance from each check would be placed in savings accounts. The certificates of deposit yielded annual interest of 7%, compounded quarterly. Patterson instructed Mrs. Hook to endorse both checks exactly as they were made payable. Check no. 713 was payable to "Nancy Hook as Guardian of the estate of Norman C. Bruner, Jr., a minor," and check no. 714 was payable to "Nancy Hook as Guardian of the estate of Karen L. Bruner, a minor." Mrs. Hook endorsed both checks under Patterson's supervision, exactly as they were made payable. Patterson then examined the front and back of each check to ascertain that the endorsement on the back of each check matched the payee's name as it was displayed on the front of each check. Patterson testified that he remembered telling Mrs. Hook to endorse the checks exactly as they were made payable, and

that he remembered looking at the checks to see that the endorsement matched the payee. However, Patterson did not remember whether he noticed that the checks were made out to Mrs. Hook in her capacity as guardian of the two children.

Mr. Patterson had the certificates of deposit drawn up, and his signature appeared on each. The two certificates of deposit and the two savings accounts created on January 13, 1975, did not reflect the fiduciary character of the funds. Certificate of Deposit No. 5297 was made out to "Nancy Hook (359–34–2583) or Norman C. Bruner, Jr., either or survivor." Certificate of Deposit No. 5298 was made out to "Nancy Hook (359–34–2583) or Karen L. Bruner, either or survivor." The balance from each check was deposited in a separate savings account opened in Mrs. Hook's name and the name of the child from whose check that balance was derived. Patterson did not give Mrs. Hook any other choices as to how to make out the title on the certificates of deposit or how to word the title on the savings accounts.

On October 24, 1975, respondent Hook and her husband came to the bank (Trenton Trust Company) seeking a personal loan of five to six thousand dollars. As in numerous prior transactions, the Hooks spoke with Charles Patterson concerning the loan. Patterson asked whether the Hooks had any property that could be used as collateral and then told them that the certificates of deposit could be used for that purpose. Before visiting the bank on October 24, 1975, the Hooks did not know that they could pledge the certificates of deposit as security for a loan. When the Hooks were advised that they could use one of the certificates of deposit to secure a loan of up to $11,000, they decided to and did borrow the full $11,000. The Hooks executed a demand promissory note in the amount of $11,000 with annual interest of 9% and monthly payments of $198.29 per month, and executed a security agreement pledging Certificate of Deposit No. 5297 to secure the loan. Charles Patterson executed the security agreement on behalf of appellant Trenton Trust Company.

On November 4, 1975, Mr. and Mrs. Hook borrowed another $11,000 from appellant, executed another demand promissory note in principal amount of $11,000, and executed a security agreement pledging Certificate of Deposit No. 5298 to secure the loan. Once again, Patterson executed the security agreement for and on behalf of appellant.

On January 21, 1976, the two promissory notes were consolidated into one promissory note in principal amount of $22,000. On October 21, 1976, respondent Hook executed a letter which acknowledged that the two certificates of deposit had been pledged as "collateral to borrowed funds now and in the future."

Patterson testified that he did not know and did not remember on October 24, 1975, or on November 4, 1975, or on January 21, 1976, that the certificates of deposit pledged as security were purchased with a fund held by Mrs. Hook in her capacity as guardian of her minor children. Patterson testified that he specifically remembered that Mrs. Hook had not mentioned on October 24, 1975, the source of the funds that had been invested in the certificates of deposit. Patterson denied that he remembered any mention of Mrs. Hook's deceased ex-husband, or of the ex-husband's connection with the checks from the insurance company. Although Patterson said he did not make any statement on October 24, 1975, that he remembered creating the certificates of deposit back in January, Mrs. Hook testified that it was discussed in the course of their conversation.

Respondent Hook resigned as guardian of the estate of each of the Bruner children on December 28, 1976. Respondent Kenneth R. Lewis was appointed successor guardian on February 9, 1977. In a letter apparently dated January 27, 1977, respondent Lewis informed appellant Trenton Trust Company that the two certificates of deposit that Mrs. Hook attempted to pledge as security for her loans were owned by a guardianship and demanded their return. Respondent Western Surety Company made a similar demand on appellant.

On May 25, 1977, appellant filed its petition for a declaratory judgment that the security agreements executed by Mr. and Mrs. Hook are valid and that appellant is entitled to maintain the certificates of deposit as security for the $22,000 promissory note. Respondent Western Surety Company filed a cross-claim against respondent Nancy Hook; respondent Kenneth R. Lewis as guardian of the Bruner children filed cross-claims against respondents Western Surety Company and Nancy Hook and a counterclaim against appellant. By agreement the case proceeded to trial on the issues raised by appellant's petition for a declaratory judgment and the counterclaim filed by respondent Lewis, the issues raised by the cross-claims being reserved for separate trial.

Jury trial was waived and the case was tried to the court on September 23, 1977. On April 27, 1978, the court filed written findings of fact and conclusions of law. The court set forth the facts substantially as recited above, and found "that [appellant Trenton Trust Company], acting by and through its officer, Charles Patterson, had actual knowledge of the source and ownership of said insurance proceeds and knew that the same constituted property of the guardianship estates." The court further found:

that [appellant] had actual and continuing knowledge of the ownership of said funds up to and including the date when [respondent] Nancy Hook pledged said Certificates of Deposit for her personal debts. The Court further concludes that [appellant] benefited financially from said transactions with actual knowledge of the breach of duty by the fiduciary, [respondent] Nancy Hook, which constitutes bad faith on the part of the [appellant].

The court held the security agreements and collateral pledge agreements were invalid. The court ordered appellant to deliver the certificates of deposit together with interest thereon to respondent Lewis, and ordered respondent Hook to endorse or assign the certificates of deposit to respondent Lewis as guardian.

Appellant's timely motion for a new trial was overruled on July 7, 1978. On July 13, 1978, appellant filed its notice of appeal with the Circuit Court of Grundy County. The Court of Appeals, Western District, filed an opinion on September 4, 1979, that would reverse the judgment and remand the case with directions to enter judgment in favor of Trenton Trust Company. The court of appeals stated that when Mrs. Hook pledged the certificates of deposit as security for her personal debt, Patterson "no longer had" any memory of the fiduciary character of the funds, and that the trial court's judgment rested "on an assumed actual knowledge," on "imputed knowledge," and on "constructive notice." The court of appeals overruled respondents' motion for rehearing or transfer on October 1, 1979. On October 11, 1979, respondents filed application to transfer the case to this Court, alleging that the appropriate standard of conduct required by the "bad faith" test found in §§ 456.260 and 456.310, RSMo 1978, was a question of general interest, and one requiring reexamination of the existing law. On November 14, 1979, we ordered the case transferred to this Court. We decide the case as though on original appeal. Mo.Const. art. V, § 10.

Appellant seeks to characterize as separate and discrete transactions the purchase of the certificates of deposit using fiduciary funds on January 13, 1975, and the pledge of each certificate as security for personal debts of the guardian to appellant in October and November of 1975. Appellant contends that the investment of fiduciary funds in certificates of deposit in the first transaction was expressly authorized by § 475.190.1(10), RSMo 1978, and thus did not constitute a breach of respondent Hook's fiduciary duties to her wards. Appellant also contends that both the negotiation of the insurance checks and the pledge of the certificates were transactions within the Uniform Fiduciaries Act, §§ 456.260 and 456.310, RSMo 1978. Appellant maintains that, both in creating the certificates of deposit and in subsequently accepting them as collateral to secure a personal loan to respondent Hook, it acted without knowledge of a misappropriation and, that it acted in good faith. Appellant further contends that in accepting the pledge of the certificates of deposit to secure a personal loan to respondent Hook, appellant was a holder in due course of the certificates within the provisions of the Uniform Commercial Code, §§ 400.3–302(1)(c) and 400.3–302(4), RSMo 1978, and that it therefore took the certificates of deposit free of the defenses asserted by respondents.

Appellant characterizes this dispute as one between a country bank and an insurance company and suggests that the children are protected by the surety bond regardless of the outcome of this suit. Appellant states that country banks are not insurance companies under the Uniform Fiduciaries Act and the Uniform Commercial Code. Appellant stresses that it is Western Surety Company that guarantees respondent Hook's performance and that it is Hook, and not the country bank, who is the fiduciary in this case. We would point out that appellant enjoys a preferred status and special privileges under § 362.105.2, RSMo 1978, because it is a trust company and not merely a bank. We find nothing in the letter, intent or history of the banking statutes or the law of fiduciaries that accords preferred status to the class of "country banks." We are certain that appellant would not want to represent to this Court that it is no longer prepared or willing to fulfill its responsibilities as a duly qualified trust company.

This is not, as appellant would have us believe, merely a dispute between the bank and an insurance company. If appellant is permitted to retain the certificates of deposit in this case, the minor wards involved will not be fully protected by the surety's bond. The estate of each child included, in addition to the $12,228.82 in insurance, $5,000 derived from a death benefit plan and $2,000 interest in the estate of Norman C. Bruner, Sr. In addition to appraised and inventoried assets of $19,228.82, in each child's estate, there is interest from October and November of 1975 to mid-1980 at 7% compounded quarterly on the $11,000 in-

vested in the certificates for each child. This totals more than $3,500 for each child. It is clear that the $12,000 bond posted in the estate of each child is not adequate to restore to him or her an estate of more than $22,700, which may well have been dissipated by the wards' mother during her appointment as their guardian. We note that respondent Lewis posted $18,000 bond through a corporate surety on January 27, 1977, before his appointment as successor guardian on February 9, 1977. Counsel for respondent Western Surety Company stated in oral argument before this Court that successor guardian Lewis neither filed briefs nor appeared in the appeal in this case, in order to spare the estates of the children the burden of further attorney's fees.

This case is before this Court in a most unusual posture. Nancy Hook, the minors' mother and original defaulting guardian, appears as a friendly witness for appellant. If appellant prevails, the bonds will be exhausted and the remainder of the minors' estates thereby become unprotected. Nancy Hook appears without counsel throughout. Although almost half of the minors' estates are threatened with being left unbonded by the outcome of this case, we are without benefit of either briefs or suggestions from the successor guardian of the two estates.

## I. CREATION OF PERSONAL CERTIFICATES FROM FIDUCIARY FUNDS

The trial court concluded that respondent Hook's placement of the funds held by her in a fiduciary capacity in certificates of deposit "in her name as an individual in joint tenancy with minors" constitutes a breach of her fiduciary duty and that the transaction constitutes "an unauthorized contract prohibited by Section 475.135, RSMo. [1978]." The court found "that the bank actively participated in the fraud practiced on the minor wards" on January 13, 1975. Appellant argues that this conclusion is incorrect as a matter of law, pointing out that § 475.190.1(10), RSMo 1978, expressly permits a guardian to "invest the

money of the ward . . . [in] [s]avings accounts and time deposits, including time certificates of deposit in banking institutions."

The investment of wards' funds in their curator's personal name was held to constitute a breach of trust in *Park Bank v. Yerington*, 275 S.W. 970 (Mo.App.1925). In *Yerington*, the defendant deposited $5,000 of his wards' money in plaintiff bank, and took certificates of deposit in his name as guardian. The defendant afterwards directed the bank to buy government bonds to be registered in his individual name. The bank procured coupon bonds in the defendant's name as guardian, but it became insolvent before it received the registered bonds. A special deputy commissioner of finance took charge of liquidating the bank's assets. The commissioner tendered the registered bonds to the defendant, but refused to accept the certificates of deposit which the defendant held as guardian in payment for the bonds. The commissioner argued he "had no legal right to accept the moneys of said trust estate in payment for bonds registered in the name of and the property of defendant," and sought a judgment for $5,000 against the defendant. *Id.* at 971. The court of appeals reversed a judgment for the plaintiff bank and remanded the case with directions to the trial court to order the bonds delivered to the defendant on the condition that he register them in his name as guardian. The court stated: "We think there is no question but that defendant should not have had these bonds registered in his own name, and, however honest his intention might have been, he was guilty of a breach of trust." *Id.* at 972. The court continued:

Defendant has been guilty of a breach of trust in which the bank participated. It is held that, where one buys trust property with notice of a violation of the trust, he takes title subject to the trust. [Citation omitted.] It is only when one pays money or property to a trustee in good faith that he is exonerated from seeing that the money or property is properly applied. [Citations omitted.]

*Id.* The court considered the effect of § 414, RSMo 1919, which was a predecessor of § 475.190, RSMo 1978, and which authorized guardians to loan the money of their wards at the highest available legal rate of interest. The court observed that § 414, RSMo 1919, "empowered [the defendant] to purchase the coupon bonds . . ., but not to have them exchanged for bonds registered in his own name." *Id.* The court found that there was no theory on which the bank could withhold the bonds from the wards' estate, but fashioned its order to avoid turning them over to the guardian unconditionally, stating that it should "not lend its aid to defendant by making it possible for him to further violate his trust by using these bonds as his own." *Id.* The order was well grounded on the principle that a guardian may not, without breaching her trust, do any act to the detriment of her wards. *See In re Farmers' Exchange Bank of Gallatin*, 327 Mo. 640, 37 S.W.2d 936, 942 (1931); *Hennies v. Keithley*, 213 Mo.App. 529, 533, 255 S.W. 940, 941–42 (1923).

A guardian is a creature of statute, and has only those powers that are prescribed by statute. *Scott v. Royston*, 223 Mo. 568, 123 S.W. 454, 466 (1909); *State ex rel. Emmons v. Hollenbeck*, 394 S.W.2d 82, 90 n. 9 (Mo.App.1965); *Western Casualty & Surety Co. v. First State Bank*, 390 S.W.2d 913, 919 (Mo.App.1965); *In re Cordes' Estate*, 116 S.W.2d 207, 209 (Mo.App.1938). Section 475.190.1(10), RSMo 1978, empowers a guardian to invest her ward's money in time certificates of deposit, but it does not authorize a guardian to make such an investment in the guardian's personal name. It follows that, when Mrs. Hook negotiated her wards' insurance checks and created joint certificates of deposit naming herself personally as one of the payees, she breached her fiduciary obligations to her wards. *Park Bank v. Yerington*, 275 S.W. 970, 972 (Mo.App.1925). It is undisputed that the bank, acting through its agent Charles Patterson, had knowledge of, and actively participated in, Mrs. Hook's deposit of the insurance checks, made out to her as guardian, in certificates of deposit and savings accounts titled in her name personally, jointly with her wards. Nor can the authority to deposit fiduciary funds in the personal name of the fiduciary be found in § 456.310, RSMo 1978. That statute in fact contemplates that a fiduciary may be "committing a breach of his obligation as fiduciary in making such deposit."[1]

It is unnecessary to determine in this case whether appellant is entitled to retain the insurance proceeds deposited on January 13, 1975. Consequently, we do not decide that question and do not examine the knowledge and good faith of appellant in creating the joint, personally titled certificates in January of 1975.[2] At issue in this case is whether the bank was entitled, in virtue of security agreements and pledge agreements

1. Section 456.310, RSMo 1978, and the other sections of the Uniform Fiduciaries Act, do not purport to expand the powers of guardians or other fiduciaries. The Uniform Fiduciaries Act does not affect the liability of a fiduciary to her principals, but only affects the liability of persons who deal with fiduciaries. *Colby v. Riggs National Bank*, 92 F.2d 183, 188 (D.C. Cir. 1937).

2. If we were required in this case to decide the liability of appellant growing out of the negotiation of the insurance checks on January 13, 1975, we could hardly overlook that appellant was a transferee of insurance checks which wore on their face the fact that they represented guardianship funds and that the checks were "transferred in [a] transaction known by the transferee to be for the personal benefit of the fiduciary." § 456.260, RSMo 1978. Consequently, we would be hard-pressed to avoid the conclusion that, under § 456.260, RSMo 1978, appellant "is liable to the principal if the fiduciary in fact commits a breach of [her] obligation as fiduciary in transferring the instrument."

We would also find it difficult to say that the bank's actual knowledge that the respondent Hook deposited fiduciary funds in her personal name does not constitute "actual knowledge that the fiduciary is committing a breach of [her] obligation as fiduciary in making such a deposit . . . or with knowledge of such facts that its action in receiving the deposit . . . amounts to bad faith." § 456.310, RSMo 1978.

While we do not today hold that a depository bank would invariably be held liable for participating in the creation of accounts in the personal name of the fiduciary from a known fiduciary fund, it is sufficient to say that such practice should be curtailed.

formed in October and November of 1975, to retain the certificates of deposit created earlier. Determination of this question depends on the provisions of the Uniform Fiduciaries Act at the time certificates of deposit were accepted to secure personal debts of respondent Hook.

## II. ACCEPTANCE OF GUARDIANSHIP ASSETS AS SECURITY FOR PERSONAL LOAN TO GUARDIAN

Sections 456.240 to 456.350, RSMo 1978, were enacted in 1959, Laws of Mo.1959, S.B. 121, and contain provisions of the Uniform Fiduciaries Act, first promulgated by the Commissioners on Uniform Laws in 1922. The Uniform Fiduciaries Act should "be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." § 456.340, RSMo 1978.

The Uniform Fiduciaries Act was designed to facilitate commercial transactions in negotiable instruments held in trust, by relaxing "some of the harsher rules which require of a bank and of individuals the highest degree of vigilance in the detection of a fiduciary's wrongdoing." *Colby v. Riggs National Bank*, 92 F.2d 183, 198 (D.C. Cir. 1937); *National Casualty Co. v. Caswell & Co.*, 317 Ill.App. 66, 72, 45 N.E.2d 698, 701 (1942). *Accord, General Insurance Co. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo.App.1974); *St. Stephen's Evangelical Lutheran Church v. Seaway National Bank*, 38 Ill.App.3d 1021, 1024, 350 N.E.2d 128, 131 (1976); *Guild v. First National Bank of Nevada*, 92 Nev. 478, 553 P.2d 955, 958 (1976); *Edwards v. Northwestern Bank*, 39 N.C.App. 261, 266, 250 S.E.2d 651, 656 (1979); *Maryland Casualty Co. v. Bank of Charlotte*, 340 F.2d 550, 553 (4th Cir. 1965); *Davis v. Pennsylvania Co. for Insurances on Lives and Granting Annuities*, 337 Pa. 456, 460, 12 A.2d 66, 69 (1940); *Board of County Commissioners of County of Hot Springs v. First National Bank of Thermopolis*, 368 P.2d 132, 136–37 (Wyo.1962).

■ At common law, the transfer of a deposit from a trust account to a personal account did not affect its fiduciary character. *National Bank v. Insurance Co.*, 104 U.S. 54, 68–69, 26 L.Ed. 693 (1881); *Colby v. Riggs National Bank*, 92 F.2d 183, 186 (D.C. Cir. 1937); *Park Bank v. Yerington*, 275 S.W. 970, 972 (Mo.App.1925). At common law, if a bank had notice that a fund was impressed with a trust and accepted money from that fund in payment of or as security for a personal debt of the fiduciary to it, the bank would be liable to the principal if the fiduciary in fact misappropriated the fund. *Colby*, 92 F.2d at 186–87.

■ The Uniform Fiduciaries Act relieves the depository of the duty of seeing that fiduciary funds are properly applied. *General Insurance Co. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo.App. 1974); *Johnson v. Citizens National Bank of Dacatur*, 30 Ill.App.3d 1066, 1069, 334 N.E.2d 295, 298 (1975); *Sugarhouse Finance Co. v. Zions First National Bank*, 21 Utah 2d 68, 69, 440 P.2d 869, 870 (1968). The bank dealing with a fiduciary is entitled to rely on the presumption that the fiduciary will fulfill its obligations to its principal. *Southern Agency Co. v. Hampton Bank of St. Louis*, 452 S.W.2d 100, 105 (Mo.1970); *General Insurance Co. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo.App. 1974). As the depository has no duty to inquire whether the fiduciary properly applies funds held in trust, mere negligence on the part of the depository bank is not sufficient to hold it liable to the principal if the fiduciary in fact misappropriated the fund. *Edwards v. Northwestern Bank*, 39 N.C.App. 261, 266, 250 S.E.2d 651, 656 (1979); *Maryland Casualty Co. v. Bank of Charlotte*, 340 F.2d 550, 553 (4th Cir. 1965).

■ Appellant seeks to analogize the pledge of the certificates of deposit as security for the personal obligation of respondent Hook to the transfer by a fiduciary of a negotiable instrument, within the terms of § 456.260, RSMo 1978,[3] or to the with-

---

**3.** Section 456.260, RSMo 1978, provides:
 If any negotiable instrument payable or endorsed to a fiduciary as such is endorsed by

the fiduciary, or if any negotiable instrument payable or endorsed to his principal is endorsed by a fiduciary empowered to endorse

drawal of fiduciary funds deposited to the fiduciary's personal account, within the terms of § 456.310, RSMo 1978.[4] Under either provision, appellant contends that its security interest in the certificates of deposit is valid, because it accepted the certificates as security in good faith and without actual knowledge that respondent Hook was committing a breach of her fiduciary obligations.

Several sections of the Uniform Fiduciaries Act provide that a person who deals with the fiduciary will be held liable to the principal if he has actual knowledge that "the fiduciary is committing a breach of his obligation as fiduciary." §§ 456.260, 456.270, 456.280, 456.290, 456.300, and 456.-310, RSMo 1978. "Actual knowledge" of a breach of fiduciary obligation in this context has been defined to mean the "present awareness" that such a breach is taking place. *Southern Agency Co. v. Hampton Bank of St. Louis*, 452 S.W.2d 100, 105 (Mo.1970). *Southern Agency* indicates that a person dealing with a fiduciary would be subject to liability to the principal if he were presently aware that the fiduciary "is

defrauding his principal," that he is misappropriating trust funds, or that the funds are "being used for private purposes." *Id. Southern Agency* does not attempt to exhaustively list examples of knowledge that a breach of fiduciary obligations is taking place. There are many ways that a fiduciary may "breach his obligation as fiduciary" other than by defrauding the principal or misappropriating the funds or using them for private purposes. For example, a fiduciary breaches his obligation when he purchases bonds in his personal name, *Park Bank v. Yerington*, 275 S.W. 970, 972 (Mo. App.1925); when he pledges guardianship property to secure a loan without prior court approval, *Western Casualty & Surety Co. v. First State Bank of Bonne Terre*, 390 S.W.2d 913, 919 (Mo.App.1965); when he acts in any way to the detriment of the principal, *In re Farmers' Exchange Bank of Gallatin*, 327 Mo. 640, 653, 37 S.W.2d 936, 942 (1931); when he invests trust funds imprudently or fails to account for them faithfully, § 475.130.1, RSMo 1978; when he wastes the trust corpus or mismanages it, §§ 475.110 and 473.140, RSMo 1978; or

---

such instrument on behalf of his principal, the endorsee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in endorsing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is transferred by the fiduciary in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is transferred in any transaction known by the transferee to be for the personal benefit of the fiduciary, the creditor or other transferee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in transferring the instrument.

4. Section 456.310, RSMo 1978, provides:
If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to

draw checks thereon, or of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

It may be noted that the pledge of certificates of deposit to secure a loan does not constitute a withdrawal of the deposited funds. *Western Casualty & Surety Co. v. First State Bank of Bonne Terre*, 390 S.W.2d 913, 919 (Mo.App. 1965). The funds advanced to respondent Hook and her husband in October and November of 1975 were loaned to them by the bank from its own funds.

when the fiduciary fails to collect debts due the ward or pay claims due from the ward. § 475.130.3, RSMo 1978. If, in accepting a deposit of fiduciary funds or paying a check drawn on a fiduciary account, the bank acts with actual knowledge that the fiduciary is thereby breaching its duties in any of these ways, or acts in bad faith, the bank is liable to the principal under the Uniform Fiduciaries Act.

■ The Uniform Fiduciaries Act does not define "bad faith," but it does define "good faith." The statute provides that "[a] thing is done 'in good faith' within the meaning of sections 456.240 to 456.350 when it is in fact done honestly, whether it be done negligently or not." § 456.240.2, RSMo 1978. Obviously, mere negligence is insufficient to amount to "bad faith." However, it is not entirely accurate to equate "bad faith" with "dishonesty," if the latter term is taken to denote a high degree of moral guilt, or evil motives. *Guaranty Bank & Trust Co. of Alexandria v. C & R Development Co.*, 260 La. 1176, 1187, 258 So.2d 543, 547 (1972); *Maryland Casualty Co. v. Bank of Charlotte*, 340 F.2d 550, 554 (4th Cir. 1965); *Board of County Commissioners of County of Hot Springs v. First National Bank of Thermopolis*, 368 P.2d 132, 138–39 (Wyo.1962).

The term "bad faith" is borrowed from the Uniform Negotiable Instruments Act. *Maryland Casualty*, 340 F.2d at 554; *Paine v. Sheridan Trust & Savings Bank*, 342 Ill. 342, 174 N.E. 368 (1931). In *Ward v. City Trust Co.*, 192 N.Y. 61, 84 N.E. 585 (1908), the bank accepted a check drawn payable to a corporation in payment of a personal debt of a corporate executive. The court interpreted the term "bad faith" as it was used in the Uniform Negotiable Instruments Act as follows:

> Bad faith in taking commercial paper does not necessarily involve furtive motives, for it exists when the purchaser has notice of facts which, if unexplained, would show that he was taking the property of one who . . . "owed him nothing, in payment of a claim that he held against some one else."

192 N.Y. at 73, 84 N.E. at 589, citing *Rochester & Charlotte Turnpike Road Co. v. Paviour*, 164 N.Y. 281, 286, 58 N.E. 114, 115 (1900). *See Marine Bank v. Kalt-Zimmers Co.*, 293 U.S. 357, 365, 55 S.Ct. 226, 228, 79 L.Ed. 645 (1934); Scott, Participation in a Breach of Trust, 34 Harv.L.Rev. 454, 460–62 nn. 23–27 (1921). The test of "bad faith" under the Uniform Negotiable Instruments Act has been said to be whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available. Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is "bad faith" to remain passive. *Peoples National Bank v. Guier*, 284 Ky. 702, 710–713, 145 S.W.2d 1042, 1047–48 (1940); *Guaranty Bank & Trust Co.*, 260 La. at 1187, 258 So.2d at 547. *Maryland Casualty*, 340 F.2d at 554.

■ In *Davis v. Pennsylvania Co. for Insurances on Lives and Granting Annuities*, 337 Pa. 456, 12 A.2d 66 (1940), the court inquired into the proper construction of the term "bad faith" as it used in the Uniform Fiduciaries Act:

> At what point does negligence cease and bad faith begin? The distinction between them is that bad faith, or dishonesty is, unlike negligence, wilful. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith (*Union Bank & Trust Co. v. Girard Trust Co.*, 307 Pa. 488, 500, 501, 161 A. 865), unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction,—that is to say, where there is an intentional closing of the eyes or stopping of the ears.

337 Pa. at 460, 12 A.2d at 69. *See General Insurance Co. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457–58 (Mo.App. 1974). Although a showing of knowledge that the fiduciary is committing a breach of his fiduciary obligations is not necessary to prove bad faith, such a showing is clearly sufficient to prove bad faith.

The fact that one dealing with a fiduciary benefits financially from the transaction is a factor to be considered in determining whether he acted in bad faith under the Uniform Fiduciaries Act. Where a bank engages in transactions with a fiduciary and has "both reason to suspect a misappropriation by a fiduciary and a monetary interest in the continuance of such activity," the bank acts in bad faith. *Maryland Casualty*, 340 F.2d at 554; *Union Bank and Trust Co. v. Girard Trust Co.*, 307 Pa. 488, 498, 161 A. 865, 868 (1932). *See also St. Stephen's Evangelical Lutheran Church v. Seaway National Bank*, 38 Ill.App.3d 1021, 1026, 350 N.E.2d 128, 132 (1976); *People ex rel. Barrett v. State Bank of Herrick*, 290 Ill.App. 130, 134, 8 N.E.2d 71, 73 (1937); *Farmers Banking and Trust Co. of Montgomery County v. Bender*, 175 Md. 625, 3 A.2d 743, 745–46 (1939); *Downey v. Duquesne City Bank*, 146 Pa.Super. 289, 292, 22 A.2d 124, 127 (1941); *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Ninth Bank & Trust Co.*, 306 Pa. 148, 149, 158 A. 251, 252 (1932); *Schneider Fuel & Supply Co. v. West Allis State Bank*, 70 Wis.2d 1041, 236 N.W.2d 266, 270 (1975). Both *Southern Agency*, 452 S.W.2d at 103, and *Cassel v. Mercantile Trust Co.*, 393 S.W.2d 433, 438 (Mo.1965) suggest that if the banks had "benefited from the proceeds" of the fiduciary's misappropriation or "received any of the fruits" thereof, the banks could have been held liable to the principal even absent actual knowledge of a breach of fiduciary obligation. *Accord, General Insurance Co., v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo.App. 1974). *See Lucas v. Central Missouri Trust Co.*, 350 Mo. 593, 166 S.W.2d 1053, 1058 (1942), which states that a bank "may incur liability and be compelled to make good deposits by a fiduciary . . . by appropriating the fund, either with or without the fiduciary's consent, to the payment of the latter's debt to the bank."

Appellant contends that neither Charles Patterson nor any other of its employees was aware, when Patterson accepted the certificates of deposit as security for the personal loans to respondent Hook, that Hook was committing a breach of her fiduciary obligations by pledging the certificates. The fatal flaw in appellant's argument that it is not liable under the relevant provisions of the Uniform Fiduciaries Act is that the trial court expressly found that appellant's agent Charles Patterson had "actual and continuing knowledge of the ownership of said funds up to and including the date when [respondent] Nancy Hook pledged said certificates of deposit for her personal debts." Respondent Hook was pledging guardianship property as security for her personal debts. Patterson thus had actual knowledge that Hook was committing a breach of her fiduciary obligations. Patterson's knowledge may be imputed to his employer, appellant *Trenton Trust Company. Flemming v. Insurance Co. of North America*, 50 S.W.2d 177, 178 (Mo.App.1932). Moreover, Patterson's acceptance of the pledge of guardianship property to secure Mrs. Hook's personal debts, though it may not show evil or dishonest motives, certainly shows knowledge that he was taking the property of persons who owed him nothing to secure a claim he held against someone else. Patterson's failure to inquire into respondent Hook's authority to pledge assets of her words to secure her personal debts shows a "deliberate desire to evade knowledge" and an "intentional closing of the eyes or stopping of the ears."

Appellant contends that there is not a scintilla of substantial evidence in the record to support a finding that Charles Patterson remembered, on October 25, 1975, and thereafter, that the funds invested in the certificates of deposit which respondent purported to pledge as collateral were held by her as guardian of her two minor children. We do not agree. Respondent Hook testified that, as to the loan transactions of October and November of 1975, although Patterson "didn't come right out and say" that he recalled that the certificates of deposit pledged as security were the ones he created in January, "in the course of conversation it was, I imagine, discussed." This statement, taken in conjunction with other facts and circumstances in the record,

supports the inference that Patterson knew during the loan transactions that the funds used to purchase the certificates of deposit were derived from insurance checks payable to respondent Hook as guardian. Other circumstances supporting the inference that Patterson remembered the fiduciary character of the fund used to purchase the certificates at the time he entered the loan agreements include the fact that Patterson had a history of handling loans to the Hooks, and was familiar enough with their finances to make such loans without requiring the Hooks to submit a financial statement or regular loan application; that respondent Hook discussed her children with Patterson on several occasions and in the fall of 1974 told Patterson that insurance money would be coming for the kids, but that it would not be paid until Hook could "go to court" to set up a guardianship; that Patterson admitted actually examining respondent Hook's endorsement of the insurance checks as guardian, and remembered comparing the endorsement with the manner in which the checks were made payable; that Patterson knew that the choice of certificates of deposit as the mode of investment of the insurance proceeds was dictated by the relative ease with which certificates of deposit could be renewed to coincide with the differing dates on which the children would be able to take the money; and that Patterson's signature was on each certificate of deposit.[5] Against the background of this evidence, we are not willing to say that we have a clear conviction that the finding of the trial court was wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Although Patterson testified that he did not remember that the certificates of deposit represented guardianship funds it is apparent that the trial court simply did not believe Patterson's testimony in this regard. Special deference to the findings of the trial court should be accorded where those findings rest on a judgment as to the credibility of witnesses. *Id.*

In view of the trial court's finding that Patterson accepted the certificates of deposit on behalf of appellant as security for a personal loan to respondent Hook, with the present awareness that the certificates were held by Hook as guardian of her children, this case becomes indistinguishable from *Western Casualty & Surety Co. v. First State Bank of Bonne Terre*, 390 S.W.2d 913 (Mo.App.1965). In *Western Casualty*, Edward Gibson, appointed guardian of his minor son, invested his ward's assets of $2500 in a time certificate of deposit issued in his name as guardian by the defendant bank. The certificate was due on April 10, 1963, one year from the date of investment. On November 24, 1962, November 28, 1962, and December 20, 1962, respectively, the defendant bank made three loans to Gibson each in the amount of $200. Gibson signed demand promissory notes on each occasion, and pledged his ward's certificate of deposit as security for the loans. On January 30, 1963, the bank loaned Gibson $500 in exchange for a promissory note signed by Gibson as guardian of the estate of his minor son. Again Gibson pledged the certificate of deposit to secure the loan. This fourth loan was advanced only after Gibson procured and displayed to the bank a certified copy of a written order from the probate court authorizing Gibson "to withdraw a sum not to exceed $500.00 from the funds of this ward on deposit with" the defendant. *Id.* at 917. When the certificate of deposit became due and payable the bank subtracted from the $2600 principal plus interest, the amount of principal and interest that was due on Gibson's four notes ($1,118.53). When it became apparent to the probate court that Gibson was unable to account for all of the assets of the ward's estate, it removed him as guardian and entered a judgment against Gibson and his corporate surety for $2500 plus interest and costs. The surety paid to the minor's successor guardian the amount of the fund which the bank had deducted from the

---

5. The bank maintained a microfilm record of all transactions made, so Patterson could have checked the manner in which the insurance checks had been made payable and endorsed if seeing his signature on the certificates of deposit had reminded him of the January transactions.

ward's deposit, and sued the bank for that amount. The court held that the bank was liable to the surety for the $1,118.53, on the authority of § 475.135, RSMo 1978, which provides that "[n]o contract shall bind the estate of any minor . . . unless . . with the approval of the court." *Id.* at 920, citing *Weir v. Kickbush*, 353 S.W.2d 627, 634 (Mo. banc 1962).[6] The court held that the guardian's attempt to obligate the ward's estate for the payment of loans made to him was not within the guardian's authority, because Gibson had not first obtained an order from the probate court authorizing him to bind the ward's estate. 390 S.W.2d at 919. The court held the probate court's order authorizing the guardian to withdraw up to $500 of the ward's deposited funds could not be read to authorize the guardian to borrow from the defendant and pledge the ward's certificate of deposit as collateral security. *Id.* at 920. The court rejected the bank's argument that § 456.250, RSMo 1959, § 2 of the Uniform Fiduciaries Act, protected the bank from liability to the principal.[7] The court held that the loans advanced to Gibson did not constitute money "which the guardian as such is authorized to receive" within the meaning of § 456.250, RSMo 1959.

Appellant seeks to distinguish *Western Casualty* from the instant case on the ground that in *Western Casualty*, "the bank at all times knew from the face of the instrument and bank officers admitted they knew that the certificate was a guardianship asset." Appellant insists that in the case at bar "at the time of the second transaction the certificates gave no clue as to their identity as a guardianship asset and there was no evidence that Appellant knew it was dealing with Nancy Hook in her capacity as guardian." We have already dealt with appellant's contention that its employee Charles Patterson did not remember when he accepted the pledge of the certificates to secure loans to respondent Hook and her husband that she held the certificates in her capacity as guardian. The trial court found that Patterson did remember, and we do not disturb that finding. The fact that the bank learned of the guardianship by means other than examination of the face of the certificates of deposit is of no consequence, where the bank's liability is predicated on its actual knowledge of a breach of fiduciary obligations or on its bad faith.

Appellant maintains that it is a holder in due course of the certificates of

6. In *Weir v. Kickbush*, 353 S.W.2d 627 (Mo. banc 1962), this Court discussed the effect of § 475.135, RSMo, § 306 of the Probate Code, Laws of Mo.1955, p. 385; as amended, Laws of Mo.1959, H.B. 537. The Court stated:

> It would seem to be obvious that the object and purpose in enacting this particular section was to spell out more plainly the exclusive jurisdiction of probate courts then and theretofore existing over the contracts of minors, and to expressly invalidate contracts for the use of any of a minor's funds without the approval of the probate court, and thus curb any existing practices to the contrary— and undoubtedly there were such, albeit irregular and unsanctioned by the law.

353 S.W.2d at 634–35.

The Court observed that the 1959 amendment to § 475.135, RSMo, "continues the exclusive jurisdiction in the probate court over the contracts of a minor, except contracts compromising suits and contracts made with an attorney." 353 S.W.2d at 635. We would add that the 1959 amendment continues to validate the public policy invalidating unauthorized contracts and curbing any existing practice of using minor's funds without court approval. We

note that the Uniform Fiduciaries Act provisions under which appellant claims a right to the certificates of deposit were approved on June 15, 1959, as sections 4 and 9 of S.B. 121, Laws of Mo.1959, exactly one week after § 475.135, RSMo, was reenacted with amendments on June 8, 1959, as § 1 of H.B. 537. We believe the General Assembly did not intend the Uniform Fiduciaries Act provisions to create an exception to the probate court's exclusive jurisdiction to the statutory invalidation of unauthorized contracts involving a minor's estate or to the policy against unauthorized use of a minor's funds.

7. Section 456.250, RSMo 1959, provided:

> A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary; and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.

deposit to the extent of its loan to the Hooks, under § 400.3–302(4), RSMo 1978. Although appellant's brief does not spell out the consequence of this assertion, apparently it wishes to claim the rights of a holder in due course to the certificates, under § 400.3–305, RSMo 1978, which provides that such a holder "takes the instrument free from" certain claims and defenses. Even if we were to find that appellant is a holder in due course of the certificates of deposit, such status would be of no assistance to appellant in this case. Section 400.-3–305(2)(a), RSMo 1978, expressly provides an exception to the protection afforded to a holder in due course, from defenses of minors. Such a holder does not take free from the defense of "infancy, to the extent that it is a defense to a simple contract." § 400.3–305(2)(a), RSMo 1978. As we have already pointed out, the contract purporting to pledge the minor wards' assets as security for a loan without the approval of the probate court is not binding on the estate of the minor, under § 475.135, RSMo 1978. *Weir v. Kickbush*, 353 S.W.2d at 635; *Western Casualty*, 390 S.W.2d at 920. Consequently, even if appellant qualified as a holder in due course of the certificates of deposit, it would not take the certificates free of the defenses of the Bruner children.

■ Section 400.3–302, RSMo 1978, defines a holder in due course. It provides in relevant part that:

(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

(2) A payee may be a holder in due course.

. . . . .

(4) A purchaser of a limited interest can be a holder in due course only to the extent of the interest purchased.[8]

We find that appellant is not a holder in due course of the certificates of deposit in question under this definition, because appellant fails to meet the requirement of § 400.3–302(1)(c), RSMo 1978, that it take the instrument "without notice . . . of any defense against or claim to it on the part of any person." We recognize that § 400.3–304(4)(e), RSMo 1978, provides that the mere knowledge "that any person negotiating the instrument is or was a fiduciary" "does not of itself give the purchaser notice of a defense or claim." The case at bar, however, is controlled by § 400.3–304(2), RSMo 1978, which provides:

The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty.

Since we adopt the trial court's finding that Charles Patterson knew "that a fiduciary . . . negotiated the [certificates of deposit] as security for [her] own debt," we hold that appellant had notice of a claim against the certificates. Consequently, appellant at best enjoys the rights of one not a holder in due course of the certificates of deposit, and thus "takes the [certificates of deposit] subject to . . . all valid claims to it on the part of any person." § 400.3–306(a), RSMo 1978. It is hardly necessary to add that the claim to the certificates of deposit asserted by respondent Lewis on behalf of the Bruner children in his capacity as successor guardian of those children constitutes a valid claim to the certificates, and that appellant took the certificates subject to that claim.

Appellant places reliance on *Southern Agency Co. v. Hampton Bank of St. Louis*, 452 S.W.2d 100 (Mo.1970). In *Southern Agency*, the president (Phillips) of an automobile liability insurance corporation (Southern Agency) deposited checks belong-

8. "Holder" in this context is defined at § 400.1–201(20), RSMo 1978, to mean a "person who is in possession of a document of title or an instrument or an investment security drawn, issued or endorsed to him or to his order or to bearer or in blank."

ing to that corporation in the separate account of an automobile physical damage insurance corporation (Colonial) of which Phillips was sole owner. Phillips thereafter purchased cashier's checks with checks drawn on the latter account. The Court held that the bank was not liable to the principal for the misappropriation by the fiduciary in that case. The Court noted that none of the bank's employees had actual knowledge that the fiduciary was preaching any duty owed to the plaintiff corporation. *Id.* at 105. There was no evidence that there was anything unusual or open to question or suspicion in the deposit of plaintiff's checks in the fiduciary's account, or in the later procurement of cashier's checks from the funds deposited in the fiduciary's account. *Id.* at 106. There was no evidence in the record in that case that funds belonging to the principal were used to pay any personal obligation of the fiduciary to the defendant bank. *Id.* at 106. The Court stated:

> There was no evidence that defendant bank benefited from the deposit in Colonial's account of the two checks payable to plaintiff, or benefited from the proceeds of any of the three cashier's checks drawn on Colonial's account.

> There was no evidence that any specific employee handled any of the transactions in evidence, and no evidence that any specific employee had even a suspicion of wrongdoing on the part of Phillips in indorsing or depositing either of the checks made payable to plaintiff, or in obtaining the three cashier's checks in question.

*Id.* at 103. *Southern Agency* is not precedent for preferring the claim of appellant to that of the minor wards in the instant case, where the same bank employee handled a transaction transforming fiduciary funds into certificates of deposit titled in the personal name of the fiduciary and subsequently accepted the same certificates of deposit as security for a loan to the fiduci-

ary in her own name, thereby knowingly accepting funds belonging to the wards to secure a personal obligation of the fiduciary to the appellant.

 A transaction similar to the one involved in the instant case was found to subject the bank to liability to the ward in *Anacostia Bank v. United States Fidelity & Guaranty Co.,* 119 F.2d 455 (D.C. Cir. 1941). In *Anacostia,* a child's mother, acting as guardian, deposited guardianship funds in the bank and received a deposit receipt which bore four per cent interest. Sometime later she borrowed money from the bank at six per cent for her personal use, on a note which she signed personally and for which she pledged as security the deposit receipt which she held as guardian. When the bank demanded payment, she endorsed the deposit receipt, took from the bank a cashier's check to her order as guardian, and endorsed the cashier's check to the bank in payment of her personal note. The trial court directed a verdict against the bank under section 4 of the Uniform Fiduciaries Act (enacted in Missouri as § 456.260, RSMo 1978), finding that the bank acted with knowledge of the personal character of the loan, both when it accepted the deposit certificate as security and when it accepted the cashier's check payable to and endorsed by the guardian. The Court of Appeals for the District of Columbia affirmed, stating:

> The bank cannot have believed that she was so determined to enrich the bank and impoverish the ward that she continued to lend fiduciary funds to the bank at four per cent in order to borrow them back for fiduciary purposes at six per cent.

119 F.2d at 456. Appellant's knowledge that respondent Hook loaned fiduciary funds to the bank at seven per cent in order to borrow them back at nine per cent constituted knowledge that respondent Hook was committing a breach of her fiduciary obligations.[9]

9. On cross-examination, Patterson was asked why on October 24, 1975, he did not inquire of the Hooks why they did not simply use the

funds in the certificate of deposit instead of borrowing money at a higher rate of interest (9%) than that received from the bank on the

For the foregoing reasons, we affirm the judgment of the trial court.

All concur.

certificates of deposit (7%). Patterson replied that it was not unusual for people to place

certificates of deposit as collateral for loans at a higher rate of interest.